Elizabeth V. BOGOSIAN, et al.,
Plaintiffs, Appellees,

v.

James H. WOLOOHOJIAN, Harry J. Wo-
loohojian and Woloohojian Realty Cor-
poration, Defendants, Appellants.

WOLOOHOJIAN REALTY
CORPORATION, Plaintiff,
Appellee,

v.

Elizabeth V. BOGOSIAN, et al.,
Defendants, Appellees.

Rhode Island Hospital Trust National
Bank, Defendant, Appellant.

Nos. 97–2055, 97–2411, 98–1159, 98–1164.

United States Court of Appeals,
First Circuit.

Heard July 27, 1998.

Decided Sept. 11, 1998.

William R. Grimm with whom Hinckley, Allen & Snyder was on consolidated brief for Woloohojian Realty Corporation.

Richard W. MacAdams with whom Paul W. Goodale and MacAdams & Wieck Incorporated were on consolidated brief for Rhode Island Hospital Trust National bank.

Charles D. Ray with whom John W. Cannavino and Cummings & Lockwood were on consolidated brief for Elizabeth V. Bogosian.

Before BOUDIN, Circuit Judge, WELLFORD,* Senior Circuit Judge, and LYNCH, Circuit Judge.

BOUDIN, Circuit Judge.

This case principally concerns the amount owed to Elizabeth V. Bogosian for her shares in Woloohojian Realty Corporation ("WRC"). What could have been a relatively simple suit has been complicated by intervening actions by Bogosian's creditors, an eventual interpleader suit, and a number of appeals to this court. At the present time, the original parties have been litigating for over ten years.

## I. THE FACTS AND PROCEEDINGS

*The Stock Buyout Case.* On January 19, 1989, Elizabeth V. Bogosian filed this action under R.I. Gen. Laws § 7–1.1–90 to dissolve WRC, a corporation that she owned in equal parts with her two brothers. The action was

---

* Of the Sixth Circuit, sitting by designation.

brought as a diversity suit in the federal district court. The defendants were the corporation and Bogosian's two brothers.

On February 16, 1989, WRC elected to purchase Bogosian's shares under R.I. Gen. Laws § 7–1.1–90.1. Under the Rhode Island statute, Bogosian is entitled to the fair value of her shares as of January 19, 1989,[1] plus interest from the date of WRC's election to buy the shares until the date of payment in full for her shares. As of the valuation date, WRC's assets consisted substantially of twenty-one parcels of real estate, including commercial buildings, residential apartments, and undeveloped land.

The case came before Judge Boyle. Judge Boyle's first action was to provide interim relief to Bogosian. To secure her claim, he ordered WRC to give Bogosian a $10 million mortgage on a piece of property referred to as the Jamestown apartments. And, as advances on her ultimate recovery, Judge Boyle ordered WRC to make her an interim $100,000 payment in cash, and to pay her $10,000 monthly until the entry of a final judgment from which no appeal was taken.[2] In July 1990, Judge Boyle appointed a special master to value the property and much of the next two years appears to have been spent in this exercise. In August 1992, the special master presented his initial report, which valued the corporation at $13,240,404. Both parties objected to the report, and it was sent back for adjustments.

Later in 1992, WRC sold a piece of property at Routes 2 and 117 in Warwick, Rhode Island. With the profits, it issued checks payable to Bogosian for a total of $1,000,000 and delivered them to Flanders & Medeiros ("F&M"), Bogosian's then-counsel, as a partial payment for her stock. At least one objective was to stem the accrual of interest on WRC's debt to Bogosian. Rhode Island's stock buyout statute expressly provides that the "petitioner will be entitled to interest on the purchase price of the shares from the date of the filing of the election to purchase the shares." R.I. Gen. Laws § 7–1.1–90.1. When the checks were sent, interest had already been accruing under the statute for almost four years.

A dispute then arose between Bogosian and F&M over the checks because Bogosian had agreed with F&M that the first proceeds of the suit would be used to pay the money Bogosian owed the lawyers for fees. Judge Boyle later conjectured that the true reason WRC sent the checks was to provoke this controversy, although there does not appear to be actual evidence to support this theory. The resulting litigation reached this court as *Flanders & Medeiros, Inc. v. Bogosian,* 65 F.3d 198 (1st Cir.1995). The checks at issue were never cashed, but were never returned to WRC.

While the proceedings continued in the stock buyout case, there were new developments involving Bogosian, WRC, and Bogosian's creditors. In April 1993, the IRS served a notice of levy on WRC for approximately $216,000 owed to it by Bogosian. Faced with this levy and the perceived possibility that it would face double liability if it paid money out to Bogosian, WRC filed a motion with Judge Boyle seeking permission to file an interpleader action and to place all future payments to Bogosian in the registry of the district court rather than paying them directly to Bogosian.

At about the same time, Bogosian filed a motion for a protective order from the court, declaring that the $10,000 monthly payments would be exempt from liens and levies and restraining WRC from contacting any of Bogosian's creditors. WRC objected to the motion and it was referred to Magistrate Judge Boudewyns. The magistrate judge denied Bogosian's motion, and ruled that WRC should make the monthly payments into an escrow account held by its attorneys, pending Judge Boyle's determination of WRC's motion for interpleader. Ultimately, WRC

---

**1.** This date was misstated by the district court as February 16, 1989. R.I. Gen. Laws § 7–1.1–90.1 makes it clear that the earlier date controls.

**2.** WRC appealed this order to this court, where it was affirmed on January 15, 1991. *Bogosian v. Woloohojian Realty Corp.,* 923 F.2d 898 (1st Cir.

1991). In its appeal, WRC argued that the security granted was excessive and that the judge did not have the equitable power to grant interim relief. It also argued that it had revoked its election to purchase Bogosian's shares.

would place a total of $100,000 and $160,000 into two escrow accounts under this order.

More liens followed the IRS levy, including attorney's liens asserted by F&M and R. Daniel Prentiss (another counsel to Bogosian) in April and an attorney's lien asserted by Tillinghast, Collins, and Graham (yet another of Bogosian's lawyers). Prompted by these liens and by the fact that Judge Boyle still had not ruled on the interpleader motion, WRC filed a separate interpleader action on June 25, 1993. In the interpleader action, WRC asked to make all payments of any sum due (or to become due) to Bogosian into the registry of the district court, including the amounts held in the escrow accounts.[3]

The new interpleader case was assigned to Judge Pettine in July 1993, and to Magistrate Judge Boudewyns, but in October it was transferred to Judge Boyle who again assigned it to Magistrate Judge Boudewyns for settlement purposes. In March 1994, WRC sought permission in the interpleader action to put money into the registry. Over the next two months it made deposits of $95,000 and $1 million into the account. On June 2, 1994, the magistrate judge authorized the deposits that had been made. These deposits did not include the required $10,000 monthly payments, but were additional amounts paid by WRC, apparently in another attempt to stem the accrual of interest in the stock buyout case.

In September 1994, the special master produced his final report, valuing WRC at $14,-705,404, a third of which (Bogosian's share) would be $4,901,801. Both parties objected, but in April 1995, Judge Boyle affirmed the report, subject to further hearings before him on two issues: (1) WRC's claim that the value of the corporation should be discounted by what WRC referred to as discounted tax liabilities—the amount that they would have to pay in capital gains taxes if they sold (or made a taxable transfer of) properties that had been held for a long time and had increased in value; and (2) the proper rate to be fixed for prejudgment interest owed to

Bogosian. Judge Boyle did say, however, that the rate applied would be compound, rather than simple, interest.

*The Bank Claims.* At about this point in the chronology, another set of federal proceedings in the same district court intersected with the stock buyout case. These proceedings had their origin in two district court judgments obtained against Bogosian by Rhode Island Hospital Trust National Bank ("the Bank") —one from February 18, 1994, for $281,748 plus interest and costs, and one from October 28, 1994, for $1,107,295 plus interest and costs. These judgments arose from a loan the Bank made to a corporation owned by Bogosian which was guaranteed by Bogosian and another loan made to Bogosian individually. When the loans were not paid back, the Bank sued Bogosian and obtained judgments. The cases ("the Bank Case") were originally assigned to Judge Pettine, but would be transferred to Chief Judge Lagueux in September 1997, after Judge Pettine's retirement.

The Bank obtained two writs of execution against Bogosian, but it became apparent that efforts to recover from her directly would be futile. Therefore, the bank obtained from the district court a writ of trustee process. This writ allowed the Bank to levy on any property belonging to Bogosian that was in the hands of third parties, up to the amount owed to the Bank by Bogosian. Thus, WRC was required to account to the Bank for any property in its hands that belonged to Bogosian. The Bank served the writ on WRC in May 1995.

Fed.R.Civ.P. 69 provides that procedure on the execution of judgments is to be in accordance with the practice and procedure of the state in which the district court is held. Under Rhode Island law, certain types of property are exempt from attachment. R.I. Gen. Laws § 9-26-4. These include things like wearing apparel, books in family use, and tools of the debtor's occupation. In addition, there is an implied exemption for

---

**3.** The interpleader action was intended to allow the court to settle the conflicting claims of Bogosian and her creditors to the sums of money owed to Bogosian by WRC. It eventually included as defendants not only Bogosian, the IRS, and

the three law firms named in the text, but also several other law firms who asserted attorney's liens against Bogosian, and Rhode Island Hospital Trust National Bank, who was a judgment creditor of Bogosian.

property whose seizure would be against the policy of the law. The debtor must claim any exemptions that apply.

After the Bank served its writ on WRC, a magistrate judge conducted a hearing on June 6, 1995, to determine if there should be any exemptions in favor of Bogosian. Notice of this hearing was sent to both Bogosian and her counsel. Later, Bogosian claimed that she did not receive the notice, but it appears that she never claimed that her attorney did not receive notice. At any rate, neither Bogosian nor her counsel attended the hearing, and the magistrate found that there was no property that should be exempted from the writ.

In June 1995, WRC asked Judge Boyle—in light of the writ directing it to hold Bogosian's property for the Bank—to modify earlier orders he had entered directing that the $10,000 monthly subsistence payments be made solely to Bogosian herself. In July 1995, Judge Boyle denied WRC's motion. On August 8, 1995, Judge Boyle issued an order that WRC release to Bogosian the money held in the escrow accounts, finding that the magistrate judge had not had the power to order deposits into those accounts some two years before. WRC appealed both of these orders to the First Circuit.

In April 1996, this court vacated Judge Boyle's July 1995 order and remanded it for further consideration. *Bogosian v. Woloohojian*, 86 F.3d 1146 (table), 1996 WL 202226 (1st Cir. Apr. 26, 1996). Although the court did not decide whether WRC was in fact subject to conflicting directives from two district court judges, it noted the serious problems inherent in even the appearance of conflict. It directed the district court to resolve the issue, either by establishing that the orders did not conflict or by harmonizing WRC's obligations to the various claimants. The court suggested either acting on the interpleader action or consolidating the cases under one judge. Both of these were eventually done, but not until more than a year later.

*Final proceedings.* In 1996, Judge Boyle held hearings over several months to resolve the two issues he had reserved in his April 1995 order otherwise approving the special master's report as to the amount owed by WRC to Bogosian for her stock. The hearings involved witnesses from both sides as well as an expert witness appointed by the court.

Judge Boyle issued his final decision in the stock buyout case on July 31, 1997. This order provided: "WRC shall pay the plaintiff, *and only to the plaintiff personally and individually* $4,901,801.00 plus 11% interest on the balance due and owing from time to time, compounded monthly from February 16, 1989 until the plaintiff has been paid in full for all principle and interest." (emphasis in original). The order did not address any potential exposure on the part of WRC to liability to Bogosian's creditors in addition to their liability to Bogosian.

In November 1997, Judge Boyle denied WRC's motion for a new trial, to amend findings of fact, or for reconsideration, and designated his July 31, 1997, order as final. On January 2, 1998, he denied another motion for new trial (this one based on alleged newly discovered evidence) and ordered WRC to make payments directly to Bogosian, without regard to the claims by Bogosian's creditors.

WRC now appeals from three of the district court orders: the July 31, 1997, order finalizing the share price, imposing compound interest, and ordering payments solely to Bogosian; the November 3, 1997, order denying WRC's motion for new trial, to amend findings of fact and/or for reconsideration; and the January 2, 1998, order denying WRC's motion for new trial or to grant relief from judgment based on newly discovered evidence and ordering payments directly to Bogosian.

While the stock buyout case was winding toward an end, the Bank's efforts to obtain the proceeds were also continuing. Shortly after Judge Boyle's final decision in the stock buyout case, the Bank, on August 13, 1997, filed a motion in the Bank case seeking to compel WRC to deliver all property it held that belonged to Bogosian to the Bank. After the Bank case was reassigned from Judge Pettine to Chief Judge Lagueux in September 1997, he heard the motion on October 30,

1997. At that hearing, he ordered that all the money owed to Bogosian by WRC be paid into the pending interpleader action, and stated that all money in that action would then be paid to creditors before any money would go to Bogosian.

At the time of the October 1997 hearing, WRC's interpleader case had been assigned to Chief Judge Lagueux (as of August, 1997), who had then reassigned it to Judge Boyle on October 15, 1997. However, at the hearing, Chief Judge Lagueux announced that he would keep control of the interpleader case. About a month later, Chief Judge Lagueux announced that he intended to consolidate the two cases (the interpleader and the stock buyout case). On November 26, 1997, he did consolidate the cases, with the proviso. that Judge Boyle would decide all pending motions in the stock buyout case.

In December 1997, the Bank filed an answer in the interpleader action (now consolidated with the stock buyout case) so that its right to the money owed Bogosian by WRC could be determined along with the rights of her former attorneys (numbering some half-dozen firms at this time) and the IRS. The Bank now appeals, challenging Judge Boyle's direction that WRC make payments directly to Bogosian, on the grounds that it conflicts with both the interpleader action and their levy on Bogosian's property.

## II. DISCUSSION

We begin with a number of specific arguments made by WRC concerning the valuation of Bogosian's share in WRC, including issues of the proper rate of prejudgment interest to be applied. This opinion then turns to the claim made jointly by WRC and the Bank, concerning Judge Boyle's requirement that payments be made by WRC directly to Bogosian. Finally, we address several miscellaneous issues raised by WRC in its appeal.

■ *Deferred Tax Liabilities.* Many of the properties held by WRC at the valuation date had been owned by WRC for some time, and had values much higher than the prices originally paid for them. Thus, if WRC were to sell (or make a taxable transfer of) any of these properties, it would incur significant capital gains tax liabilities based on the difference between the amount the property sold for and the original price of each property. Judge Boyle held that these "potential liabilities" could not be taken into account in the valuation of WRC.

Judge Boyle's decision would be correct if there were no plans to sell any of the properties at any time in the foreseeable future, because none of the liabilities would be incurred unless the properties were sold. However, WRC took the position that its obligation to pay Bogosian for her stock compelled it to make property sales. The amount of taxes paid on any sale would, in effect, lower the price WRC would receive for these properties. In principle, the corporation was worth less because of the need to make this forced liquidation, regardless of whether the liquidation were required to pay Bogosian or anyone else with a large immediate claim.

Judge Boyle gave several reasons for his determination not to consider the tax liability, two of which are invoked by Bogosian on appeal. The first was that WRC did not have to sell property to pay Bogosian, and therefore would not necessarily have to pay the liabilities claimed. Bogosian points to two pieces of evidence that borrowing would be possible: the court's expert's report, which listed a number of possible ways for WRC to pay Bogosian, and testimony by one of WRC's experts that WRC would not default on its debt to Bogosian, partly because it could borrow money.

However, the court's expert testified at the hearing that he did not have enough information to form an opinion on WRC's actual borrowing capacity, thus contradicting his report; and WRC's expert does not appear to have testified that WRC could borrow all of the money necessary to pay Bogosian. WRC presented evidence that its cash flow would not support borrowing over approximately three million dollars; and its debt to Bogosian, with accumulating interest, greatly exceeded this figure. This evidence, combined with the fact that Bogosian points to no evidence that contradicts it, persuades us that Judge Boyle clearly erred in finding that

WRC could have borrowed the money to pay Bogosian without selling any property.

The second reason given by Judge Boyle and argued by Bogosian on appeal for disallowing the liabilities is that WRC could have used a tax-free "section 355 split-off" transaction to transfer assets to Bogosian. *See* 26 U.S.C. § 355. In a § 355 split-off, which will be tax free if certain conditions are met, a corporation transfers to a current shareholder stock or securities in a subsidiary corporation (to which some of the corporate assets could have been transferred). If, before Bogosian filed for dissolution, WRC had placed one-third of its assets into a newly-created subsidiary, it might have been able to "split-off" Bogosian by transferring the ownership of that subsidiary to her in exchange for her shares in WRC.

The main difficulty with using § 355 in this case is that a split-off transaction will be tax-free only if undertaken with a *current* shareholder. Although the issue is not entirely clear, the language of the Rhode Island statute indicates that Bogosian ceased to be a shareholder on the day WRC elected to purchase her shares rather than dissolve the corporation.[4] This interpretation is consistent with practice in the buyout proceeding, whereby the former shareholder ceases to receive dividends as of the election date, but does receive interest from that date until she is paid in full for her shares.

In other words, the use of a § 355 split off would necessarily have required anticipation by WRC, and probably agreement by Bogosian, before the election to purchase made by WRC in February 1989, almost a decade before the valuation itself. Such prescience cannot fairly be required, and indeed, Bogosian's brief scarcely argues that WRC should have anticipated this solution in 1989. Accordingly, the possibility of such a transaction at the outset—and it is only a possibility—does not answer the need to take account of the taxes on property sales that were and are required to pay Bogosian for her stock.

One other reason was given by Judge Boyle (but is not pursued by Bogosian on appeal) for refusing to consider WRC's tax liability in assessing the value of its stock. Judge Boyle said that Bogosian would pay personal taxes on the proceeds received from WRC, and that she should not pay the corporation's taxes as well. But individuals who use the corporate form to accumulate earnings or gains are normally subject to double taxation: they suffer indirectly whatever taxes are paid by the corporation and then are liable to personal tax whenever the corporation distributes earnings or the shareholder realizes gain on the sale of his or her shares.

Judge Boyle's reasoning may also have been based on the fact that the sale of Bogosian's stock was triggered by WRC's election to purchase her stock rather than dissolve the corporation. However, dissolution is a realization event for both the corporation and the shareholder (the corporation would be taxed on all of its gains on the sale of its property, and Bogosian would then be taxed on the distribution to her) as much as is the sale of stock. *See* I.R.C. §§ 331, 336. Bogosian triggered the realization herself, and is in no position to avoid the full consequences of her choice.

WRC has filed a plan to finance its purchase of shares from Bogosian which included the sale of one property, the sale or transfer to Bogosian of two other specific properties (either sale or transfer would be a taxable event for WRC), the refinancing of one property, and borrowing on such other properties as necessary to pay Bogosian. The valuation of WRC must include the expected tax liability that will be incurred on the three specifically planned sales and transfers and Bogosian will effectively shoulder one-third of the reduction. Any other decision would falsely inflate the value of WRC.

■ *The Interest Award.* Judge Boyle awarded Bogosian 11 percent interest on the balance due to her, compounded monthly from February 16, 1989. WRC challenges

---

4. The statute reads in part, "The petitioner shall be entitled to interest on the purchase price of the shares from the date of the filing of the election to purchase the shares, and all other rights of the petitioner as owner of the shares shall terminate at such date." R.I. Gen. Laws 7–1.1–90.1.

the interest award on two grounds. First, it claims that Rhode Island law does not allow an award of compound interest for actions under R.I. Gen. Laws 7–1.1–90.1. Second, it argues that the award of 11 percent interest compounded monthly was too high for the period at issue. As in all diversity cases, we look to state law for the law on prejudgment interest. *See Roy v. Star Chopper Co., Inc.,* 584 F.2d 1124, 1135 (1st Cir.1978).

■ Although our conclusion is not entirely free from doubt, we hold that Rhode Island law does not at present allow an award of compound interest in this situation (or most others), although it conceivably might do so in the future. This conclusion, which we reach as a matter of law, is consistent with our practice of not anticipating changes in state law in advance of the state courts. *See Martel v. Stafford,* 992 F.2d 1244, 1247 (1st Cir.1993); *Porter v. Nutter,* 913 F.2d 37, 40–41 (1st Cir.1990).

Judge Boyle based his award of compound interest in large part on his judgment that it was necessary to fulfill the basic purpose for awarding prejudgment interest in this type of situation. He stated that the plaintiff would not be fairly compensated for the use of her money unless she received compound interest, and that the buyout statute's provision for interest must therefore allow compound interest. Clearly, if one's money is held for a number of years, one loses not only the interest one could make on that money each year, but also the profits that could be made from investing that interest each year.

As a matter of policy, there is much to be said for Judge Boyle's approach. Certainly, it is a realistic assessment of the economic consequences for both sides of the case. Given the stock buyout election, Bogosian effectively ceased to be a shareholder under Rhode Island law as of the day she filed for dissolution, received no dividends thereafter, and was deprived not only of immediate payment but therefore also of the income she would have earned thereafter from investing the payment. Conversely, WRC has continued to be able to use Bogosian's stake, re-

taining for itself the "earnings" and able to "reinvest" those earnings itself.

The difficulty is that the Rhode Island courts, like those of many other states, have historically been hostile to the awarding of prejudgment interest, and, in particular, compound prejudgment interest. Such interest was not allowed at all at common law. *See* Dobbs, *Law of Remedies* § 3.6(1) (2d ed.1993). Even after states began to allow prejudgment interest, it was generally only available where the amount of damages was fixed and ascertainable in advance. *Cf. Restatement, Second, Contracts,* § 354, comment a (1981). Even in liquidated damages cases, only simple (not compound) interest was allowed. *See id.;* Dobbs, *supra,* § 3.6(4).

Today, in most states, prejudgment interest commonly is only allowed pursuant to statute. *See* Dobbs, supra, § 3.6(1). The Rhode Island statute that provides generally for prejudgment interest—but does not apply here—specifies that the interest is to be added by the clerk at the rate of twelve percent per annum (*i.e.* simple interest). *See* R.I. Gen. Laws § 9–21–10. The one explicit exception to the general rule of simple interest in Rhode Island proceedings is for certain eminent domain proceedings, for which a statute expressly allows compound prejudgment interest. *See* R.I. Gen. Laws § 37–6–23. Rhode Island courts consider prejudgment interest statutes to be statutes in derogation of the common law, and construe them strictly. *See Clark–Fitzpatrick, Inc./Franki Foundation Co. v. Gill,* 652 A.2d 440, 451 (R.I.1994).

R.I. Gen. Laws 7–1.1–90.1 is one of a number of statutes that refer to an award of interest from a certain date, with no indication as to whether interest should be compound or simple. But prior to Judge Boyle's decision, it does not appear that any Rhode Island court had allowed compound prejudgment interest under any statute that did not specifically authorize compound interest— prior to Judge Boyle's decision to award compound interest.[5] Indeed, the Rhode Is-

---

5. In 1997, the Rhode Island Superior Court for Providence County awarded compound prejudg-

ment interest under R.I. Gen. Laws 7–1.1–74 (regarding judgments involving corporate repur-

land Supreme Court appears to disfavor compound interest. *See Atlantic Refining Co. v. Director of Public Works,* 104 R.I. 436, 244 A.2d 853 (1968).

Accordingly, we conclude that Rhode Island courts would not allow an award of compound prejudgment interest under R.I. Gen. Laws 7–1.1–90.1. As simple interest, the 11 percent award can stand despite WRC's claim that it is itself excessive. But 11 percent is close enough to the boundary of reasonableness that we do not think that the change from compound to simple interest is enough to justify raising the rate any higher. In addition, Bogosian has not requested such a recalculation. Therefore the rate of 11 percent per annum simple interest will stand.

*Interest Abatements.* Perhaps the most difficult issue in this case concerns the district court's refusal to treat three attempted or actual payments by WRC as cutting off the accrual of interest as to those amounts. Each of these claimed interest abatements comprises a different story. However, before turning to those stories, we address Judge Boyle's general rationale for not allowing any of the interest abatements.

■ Judge Boyle based his disallowance of the interest abatements on the fact that he had not approved the payments at issue. The Rhode Island statute gives the judge general authority, after determining the fair value of the stock to

> set forth in its order directing that the stock be purchased, the purchase price and the time within which the payment shall be made, and may decree such other terms and conditions of sale as it determines to be appropriate, including payment of the purchase price in installments extending over a period of time.

R.I. Gen. Laws 7–1.1–90.1. There is no claim that Judge Boyle barred the prejudgment payments before they were made. Absent such an order (whose validity we need not

decide), we see no legal basis for Judge Boyle's assumption that the court's prior permission was required.

■ Although the issue is not litigated often, it is a general rule that interest will not accrue after a valid tender. *See Garfinkle v. Chestnut Hill Mortgage Corp.,* 679 F.2d 276, 278 n. 3 (1st Cir.1982); *see also Illini FS, Inc. v. Myerscough,* 137 Ill.App.3d 861, 92 Ill.Dec. 440, 484 N.E.2d 1385, 1390 (1985) (partial payment toward satisfaction of a judgment stopped the further accrual of interest on all but the unpaid portion of the debt). In addition, there is no evident policy reason why a debtor should not be able to cut off interest by tendering a portion of the debt to the creditor, who will then enjoy the use of the money himself.

■ Of the three payments by WRC, the easiest of the three to resolve is the $1,095,000 paid by WRC into the district court registry in April and May 1994 under circumstances already described. WRC completely gave up control of the money, and when the money is paid out of the registry, the interest will follow the principal. The general rule is that money paid into the registry of a court will stop the running of interest. *See, e.g., Wm. A. Smith Contracting Co. v. West Central Texas Municipal Water District,* 344 F.2d 470, 475 (5th Cir. 1965); *Beaudry v. Favreau,* 99 N.H. 444, 114 A.2d 666, 669 (1955).

Bogosian does not directly dispute the general rule but repeats Judge Boyle's assertion that his prior permission was required, an argument we have already rejected. Bogosian also argues that the money put into the registry was the "same" money WRC tried to pay her earlier by sending her checks totaling one million dollars through her law firm. Since the money paid into the registry was in fact paid by WRC and accepted by the registry, we will consider the "duplication" argument in connection with the uncashed checks.

---

chasing of shares). *Diluglio v. Providence Auto Body, Inc.,* 1997 R.I.Super. 240, 1997 WL 839900 (1997). This decision cites for support Judge Boyle's earlier opinion in this case, but the opinion misreads Judge Boyle's opinion as if it stated that the Rhode Island Supreme Court had approved compound interest in this type of situa-

tion. The Rhode Island Supreme Court has not approved the awarding of compound interest, and the decision in *Diluglio* cites no Rhode Island precedent to support its decision. The only stock buyout cases cited by Judge Boyle involved other jurisdictions, some of which allow compound interest by statute.

■ We reject WRC's second claimed abatement for $2,300,000 that it claims it would earlier have paid Bogosian if it had been allowed to refinance the Jamestown apartments in 1991. The reason WRC could not carry through its plan was Bogosian's objection to a substitution of collateral (she held a second mortgage on the Jamestown apartments, which she would have had to give up or subordinate in the refinancing). Although WRC's offer of over $2 million in cash and a first mortgage on one of two other pieces of property may have been reasonable, we will not second guess the district court's decision that Bogosian could retain the security in the Jamestown apartments given to her by court order.

■ The third claim—that WRC should receive an abatement for the checks totaling $1 million dollars that were sent by WRC to Bogosian through her then-counsel F&M but were never cashed—is the most difficult issue to resolve. Shortly after the checks were received by F&M, Bogosian informed F&M that she did not want to accept the checks because she still hoped to receive most of her share of WRC in the form of property. However, F&M did not return the checks to WRC, and Bogosian and F&M began negotiating over the money the checks represented. This dispute eventually ended up in federal court, but the checks were still neither cashed nor returned, and apparently stayed in the possession of F&M until they were subpoenaed in the stock buyout case.

Bogosian never informed WRC that she intended to reject the checks, or that she intended never to cash them. Since a valid tender does stop the accrual of interest, it was obviously bad strategy merely to hold the checks, failing either to deposit them or to reject the tender (if possible). If Bogosian's only argument was that her lawyers acted inappropriately, it would not be fair to

charge this to WRC, and WRC would be entitled to an interest abatement.

However, Bogosian also argues that WRC should not receive credit for this payment because this same money was later used to make the later payments into the registry. In fact, WRC did know that there was a controversy between F&M and Bogosian, and that the checks had not been cashed in timely fashion, and WRC did withdraw the money in the account apparently about a month after the checks were delivered, although it did ensure that the bank would continue to honor checks drawn on the account for a number of months.[6] By the time the overdraft protection had expired, it must have been clear that the checks simply were not going to be cashed.

We conclude that WRC is entitled to an interest abatement from the time of the delivery of the checks to the time that the overdraft protection expired. As to the period following expiration, our own inclination would be to deny any further abatement as duplicative of the abatement due to the deposit in the registry; but this is a choice within the equitable discretion of the district court, which is free on remand to decide the issue either way.

■ *Payments Directly to Bogosian.* Both WRC and the Bank object to the provision in Judge Boyle's July 31, 1997, order (quoted above) that all payments in the stock buyout case be made directly to Bogosian, without regard to the interpleader case or any of the liens against the judgment.[7] They argue that this provision conflicts with the Bank's right to collect its judgments under Rhode Island law and with Chief Judge Lagueux's orders in the interpleader case that the proceeds be held pending decision in that action. In addition, WRC argues that it may be exposed to multiple liability if it is forced to pay directly to Bogosian money on which there are outstanding liens.

---

**6.** It is not clear from the record exactly how long this overdraft protection lasted, although there is some indication in the record that it may have expired around the time the money was placed in the registry.

**7.** This provision covered both the amount now determined to be due as the balance and the

$10,000 monthly payments (which would continue until payment was made in full, and would be deducted from the total balance). This direction to pay the $10,000 monthly payments directly to Bogosian was echoed in the January 2, 1998, order which was also the subject of separate appeals by WRC and the Bank.

Bogosian says that Judge Boyle's order does not conflict with Chief Judge Lagueux's order. We need not decide whether there is a direct conflict between the district court orders or, if so, which would prevail. Even if there was no conflict with another district court order, it is our view that Judge Boyle did not have the power to override the Bank's writ of trustee process (or other liens obtained by Bogosian's creditors).

We face here a purported conflict between provisions of Rhode Island law—on one side, the Bank's trustee process obtained under Rhode Island procedures, and on the other R.I. Gen. Laws § 7–1.1–90.1, which directs that the court "may decree such other terms and conditions of sale as it determines to be appropriate, including payment of the purchase price in installments extending over a period of time." Bogosian has not pointed to any case holding that this general language in the stock buyout statute overrides any other provision of Rhode Island law, such as those that govern priorities, liens, and attachments.

In our view, the "appropriate" terms and conditions provision is directed to the mechanics of the stock purchase and payment as between the company and the former shareholder. It is too big a leap to treat this terse and general provision as allowing the judge in the stock buyout case to override an entire body of state lien law protecting the interests of third parties in other cases, merely because the proceeds happen to derive from an award made by the judge. This is an untenable intention to impute to the Rhode Island legislature based on an ancillary provision in a narrowly focused statute regulating stock buyouts.

■ Bogosian also argues that the $10,000 monthly payments should be exempt from the liens against her because they were granted by Judge Boyle for her sustenance. However, Bogosian did not object to the writ of trustee process and did not attend the hearing at which she could have asserted exemptions to the writ. As for Bogosian's claim of lack of personal notice, she could have pursued it before the magistrate judge by a post-judgment motion but may not collaterally attack the ruling in this court.[8] If our resolution of this issue creates hardship for Bogosian, she remains free to ask the district court to reconsider the contemplated three-year schedule of payments by WRC.

Three remaining issues raised by WRC do not require much discussion. WRC claims that the judge should have adjusted the interest rate downward for Bogosian's intransigence in resisting a settlement. Most of the evidence concerned a global settlement which would have resolved not only the stock buyout case but also other controversies between Bogosian and her brothers. Any judgment about the reasonableness of the parties' positions on settlement is peculiarly within the expert knowledge of the district judge, and we decline to disturb that judgment here.

■ We also reject WRC's claim that Judge Boyle was required to recuse himself. The ground for the motion was that Judge Boyle conducted of an informal settlement conference concerning the checks sent by WRC to Bogosian through F&M which—according to WRC—led him to acquire personal knowledge of disputed material facts in the case. Judge Boyle was acting in a judicial capacity in seeking to resolve a lawyer-client controversy affecting litigation before him, namely, the stock buyout case. Accordingly, whatever knowledge he acquired was not "personal" knowledge raising a recusal question. *In re Martinez–Catala*, 129 F.3d 213, 219 (1st Cir.1997).

■ Finally, WRC says that it was entitled to a new trial in the stock buyout case because of new evidence. The evidence here is Bogosian's successful support for a lesser interest rate (8 percent simple interest) in another one of her many cases. It is difficult to imagine that WRC seriously imagined that the district court would reopen 10 years of litigation on this ground. In all events, the

---

**8.** Even were Bogosian to have argued for such an exemption, it is unlikely that the $10,000 monthly payments would have been judged to be exempt. They do not fit into any of the catego- ries of exempt assets listed in R.I. Gen. Laws 9–26–4, nor would $120,000 per year automatically be considered property necessary for the debtor's day-to-day well being.

refusal to do so was not an abuse of discretion.

For the reasons stated above, we affirm the district court's order of November 3, 1997, and affirm in part and reverse in part the district court's orders of July 31, 1997, and January 2, 1998, and remand for proceedings consistent with this opinion.

*It is so ordered.*