IMPERIAL CASUALTY AND
INDEMNITY COMPANY

v.

Amitie BELLINI et al.

No. 2007–140–Appeal.

Supreme Court of Rhode Island.

May 29, 2008.

Thomas R. Bender, Esq., Providence, for Plaintiff.

Bernard P. Healy, Esq., Providence, for Michael DeSantis et al. for Defendant.

Present: WILLIAMS, C.J., GOLDBERG, FLAHERTY, SUTTELL, and ROBINSON, JJ.

## OPINION

Justice ROBINSON for the Court.

The appellants, Amitie Bellini, Norbell Realty Corporation, and Michael DeSantis, appeal to this Court from the entry of judgment in favor of Imperial Casualty and Indemnity Company.

This case came before the Supreme Court for oral argument on April 8, 2008, pursuant to an order directing the parties to appear and show cause why the issues raised in this appeal should not be summarily decided. After considering the record, the memoranda submitted by the parties, and the oral arguments of counsel, we are of the opinion that cause has not been shown and that the case should be decided at this time. For the reasons set forth below, we deny the appeal and affirm the judgment of the Superior Court.

### Facts and Travel

The facts of this case are not in dispute, and our narrative thereof is based on the factual recitation set forth in this Court's opinion issued at an earlier point in the history of this exhaustively litigated case—a case which stems from events that occurred some twenty-three years ago. *See Imperial Casualty and Indemnity Co. v. Bellini,* 888 A.2d 957 (R.I.2005); *see also Imperial Casualty and Indemnity Co. v. Bellini,* 746 A.2d 130 (R.I.2000).

### A. The Injury to Mr. DeSantis

On October 8, 1985, Michael DeSantis, an employee of the United States Postal Service, was delivering mail at 24 Atwood Street in Providence. Just after Mr. DeSantis had completed his delivery of mail, a step at that property collapsed beneath him and he fell and was injured.

Earlier that year, Amitie Bellini, the owner of the Atwood Street property, had conveyed her interest in the property to Norbell Realty Corporation (Norbell). Ms. Bellini served as a principal in and owner of that corporation. The conveyance was recorded on May 6, 1985.

Subsequently, on May 12, 1985, Imperial Casualty and Indemnity Company (Imperial) issued an insurance policy to Ms. Bellini; that policy covered a number of properties, including the property located at 24 Atwood Street. Norbell was not listed as an insured in that policy.

Thereafter, on October 31, 1985, Imperial issued an endorsement to the above-referenced policy. That endorsement added Norbell as an "additional insured" with respect to another property; that property was located on Pocasset Avenue in Providence. The October 31 endorsement made no reference to the Atwood Street property.

In January of 1986, Imperial received notice that Mr. DeSantis had been injured at the Atwood Street property. Then, in November of 1987, Mr. DeSantis proceeded to file a lawsuit in the Superior Court against Norbell, wherein he sought dam-

ages for personal injury. As it commenced an investigation of Mr. DeSantis's claims, Imperial issued two letters reserving its rights. The letter relevant to the issues in this case was dated December 30, 1987, and it questioned whether or not Norbell actually qualified as an additional insured under the policy. The implication was that, if Norbell was not an additional insured, Imperial would not be obligated to compensate Mr. DeSantis with respect to any injuries that he had incurred.

## B. The Commencement of Litigation

The above-summarized events gave rise to three separate legal actions: (1) a personal injury action in which Mr. DeSantis prevailed against Norbell (the Norbell Personal Injury Action); (2) a declaratory judgment action that Imperial brought in order to obtain a ruling as to its potential liability under the insurance policy (the Declaratory Judgment Action); and (3) a direct action by Mr. DeSantis against Imperial wherein he asserted that the insurance company was required to compensate him pursuant to the judgment that he had obtained against Norbell in the first legal action (the Imperial Action).

On July 24, 1991, Imperial sent Ms. Bellini a letter demanding that she pay a $250 deductible. Ms. Bellini paid this deductible with a check that was dated August 29, 1991. Imperial's demand for payment of the deductible in this regard would later become a highly material fact in the litigation among the parties.

Also in 1991, the Declaratory Judgment Action was commenced in the Superior Court. Through that procedural vehicle, Imperial sought judicial construction and interpretation of the terms and conditions contained in the policy that it had issued with respect to the Atwood Street property; its contention was that said policy did not provide coverage to Norbell with respect to the October 1985 incident. Norbell and Ms. Bellini were named as defendants in the Declaratory Judgment Action, and subsequently Mr. DeSantis intervened in that action.

Imperial proceeded to defend Norbell in the Norbell Personal Injury Action, which Mr. DeSantis had brought against Norbell in the Superior Court. In February of 1992, a jury returned a verdict in his favor and awarded damages in the amount of $235,000. However, following the filing of a motion for remittitur, that amount was reduced by the court to $155,000. Norbell obtained a stay of execution, and thus it was not obligated to pay that amount pending the resolution of the Declaratory Judgment Action.

Following Mr. DeSantis's success in the Norbell Personal Injury Action, and while the Declaratory Judgment Action was still pending, Mr. DeSantis (the insured's rights having been assigned to him) filed a direct action against Imperial (the Imperial Action), in which he sought to hold Imperial liable for the judgment against Norbell and in which he alleged that Imperial had breached its duty of good faith. At that point, Imperial moved to dismiss the complaint. The motion to dismiss was denied, but a separate motion seeking consolidation of the Imperial Action and the Declaratory Judgment Action was granted.

Imperial moved to sever Mr. DeSantis's claim for bad faith from his other claims, but the motion was denied. Imperial filed a petition for certiorari with respect to that denial on November 18, 1998, which petition this Court granted; Mr. DeSantis's bad faith claim was subsequently severed from the other claims in the consolidated action. *Imperial Casualty and Indemnity Co. v. Bellini*, 746 A.2d 130 (R.I.2000).

## C. The Trial on Remand

The case was remanded to the Superior Court, and a bench trial took place from January 13 to January 16, 2003; at the conclusion of the trial, the trial justice ruled in favor of Imperial. The trial justice also permitted Imperial to withdraw funds that had been deposited in the registry of the court as security for the judgment that Mr. DeSantis had obtained against Norbell. The trial justice also lifted the stay on the execution of that judgment.

## D. Appeal to this Court

Mr. DeSantis, Ms. Bellini, and Norbell appealed to this Court from the just summarized ruling. On December 22, 2005, we reversed, holding that Imperial had waived its right to deny coverage when it had demanded and thereafter accepted Ms. Bellini's payment of a $250 deductible. *Imperial Casualty and Indemnity Co.*, 888 A.2d at 964. We concluded that, because Imperial had demanded the deductible from Ms. Bellini despite its awareness of the indeterminacy with respect to the policy's coverage, Imperial had in effect waived its right to deny coverage. *Id.* As we said in that case, "[w]e disagree with the logic that an insurance company may avoid waiver by, on the one hand, insisting on compliance with an insurance contract, and, on the other hand, insisting that the insurance contract affords no coverage to the party claiming defense or indemnity under the provisions of the policy." *Id.*

## E. Remand; Motions for Summary Judgment

The case was remanded again. On remand, Mr. DeSantis moved for partial summary judgment on his debt on judgment claim and contended that compound postjudgment interest should be added to that amount.[1] Imperial did not dispute that it owed Mr. DeSantis a sum of money, but it did dispute the amount it owed because it disagreed with Mr. DeSantis's contention that compound interest was appropriate.

A hearing was held before a different justice of the Superior Court on April 11, 2006. Counsel for Mr. DeSantis asserted that the language of G.L.1956 § 9–21–10[2] "by its express terms * * * directs that post-judgment interest be compounded on an annual basis." The hearing justice disagreed, stating:

> "[T]he post-judgment interest doesn't just go on the principal, it goes on the principal and prejudgment interest. Clearly, that is correct. I don't get where you get the compounded language from that."

---

1. As of the date of the hearing on Mr. DeSantis's motion for partial summary judgment, the amount which he claimed he was owed by Imperial, including compound interest, was $1,298,155.96. The hearing justice determined that Imperial owed Mr. DeSantis $738,793.98, which amount included simple, rather than compound, interest.

On February 22, 2006, the parties filed a stipulation in which Mr. DeSantis acknowledged that he had received $738,793.98. That amount included the judgment that had been entered on July 14, 1992 plus simple postjudgment interest through February 15, 2006.

2. General Laws 1956 § 9–21–10(a) reads in pertinent part as follows:

"In any civil action in which a verdict is rendered or a *decision made for pecuniary* damages, there shall be added by the clerk of the court to the amount of damages interest at the rate of twelve percent (12) per annum thereon from the date the cause of action accrued, which shall be included in the judgment entered therein. Post-judgment interest shall be calculated at the rate of twelve percent (12) per annum and *accrue on both the principal amount* of the judgment *and the prejudgment interest* entered therein." (Emphasis added.)

The hearing justice further remarked that, in cases wherein this Court has discussed interest, we have "always specifically said the Legislature intended * * * simple interest and not to be compounded * * *." Accordingly, the hearing justice granted Mr. DeSantis's motion for partial summary judgment, but she ruled that simple interest, not compound interest, would be added to the sum that Imperial owed him.

Subsequently, Imperial moved for summary judgment on the remaining issue— *viz.*, the bad faith claim. That motion was heard on June 20, 2006. Imperial argued in that hearing that G.L.1956 § 9–1–33(a) confers on an insured, but not on an assignee, the right to bring a claim for bad faith against an insurer when it is alleged that "[the] insurer wrongfully and in bad faith refused to pay or settle a claim made pursuant to the provisions of said policy."[3] The statute, counsel for Imperial further argued, "gives the right to the insured to bring a claim for bad faith * * * [and] DeSantis is not the insured." Counsel for Imperial additionally argued: (1) that the entire amount of the judgment had, as of that point, been paid to Mr. DeSantis; and (2) that, because there was no bad faith evinced on the part of Imperial, there was no remaining claim that Norbell *could have* assigned, even if assignment were permitted. Counsel for Mr. DeSantis argued that any bad faith claims were, in fact, assignable, and that bad faith on the part of Imperial had been demonstrated.

### F. The Hearing Justice's Decision

At the June 20, 2006 hearing on Imperial's motion for summary judgment, the hearing justice reviewed the facts and the history of the case, taking note of the fact that Ms. Bellini had assigned to Mr. DeSantis "all rights, actions, or causes of action that she had, either on her own behalf or on behalf of Norbell." With respect to the issue of whether or not rights against Imperial were assignable to Mr. DeSantis, the hearing justice ruled that the direct action statute, G.L.1956 § 27–7–2,[4] "does not contemplate an action of the insured party in bad faith." She further stated:

> "[T]hat statute is designed to provide the injured party the ability to proceed against an insurer to collect the judg-

---

**3.** General Laws 1956 § 9–1–33 provides in pertinent part:

"Notwithstanding any law to the contrary, an insured under any insurance policy as set out in the general laws or otherwise may bring an action against the insurer issuing the policy when it is alleged the insurer wrongfully and in bad faith refused to pay or settle a claim made pursuant to the provisions of the policy, or otherwise wrongfully and in bad faith refused to timely perform its obligations under the contract of insurance. In any action brought pursuant to this section, an insured may also make claim for compensatory damages, punitive damages, and reasonable attorney fees."

**4.** General Laws 1956 § 27–7–2 provides in pertinent part:

"An injured party, or, in the event of that party's death, the party entitled to sue for that death, in his or her suit against the insured, shall not join the insurer as a defendant. If the officer serving any process against the insured shall return that process 'non est inventus', * * * or where a suit is pending against an insured in his or her own name and the insured died prior to judgment, * * * the injured party, and, in the event of that party's death, the party entitled to sue for that death, may proceed directly against the insurer. The injured party, or, in the event of that party's death, the party entitled to sue for that death, after having obtained judgment against the insured alone, may proceed on that judgment in a separate action against the insurer; provided, the payment in whole or in part of the liability by either the insured or the insurer shall, to the extent of the payment, be a bar to recovery against the other of the amount paid."

ment already obtained against the insured. Without any legal authority that states otherwise, it cannot be said * * * that [the] statute is intended to do anything else. I don't believe Mr. DeSantis has a right to assert a claim of bad faith in his own right."

The hearing justice observed that the only way that Mr. DeSantis could have acquired a bad faith cause of action against the insurer was if Norbell (as opposed to Ms. Bellini) had assigned it to him. The hearing justice went on to state, however, that such actions are generally not assignable, aside from the discrete exception that such rights are assignable when an insurer's bad faith refusal to settle results in a judgment in excess of the policy limits. In those circumstances, the hearing justice noted, the injured party may be allowed to proceed directly against the insurer.

The hearing justice ruled that that exception, which had been delineated in *Mello v. General Insurance Co. of America*, 525 A.2d 1304 (R.I.1987), did not apply to the facts in the case at hand. Accordingly, she granted the motion for summary judgment.

The Superior Court's judgment was entered on July 6, 2006; Mr. DeSantis, Ms. Bellini, and Norbell timely appealed.

### G. The Appellants' Arguments on Appeal

On appeal, appellants argue that the hearing justice erred in ruling that Norbell did not possess an outstanding bad faith claim against Imperial and that summary judgment should not have been granted.

They additionally contend that the hearing justice erroneously concluded that Mr. DeSantis, as an assignee, did not have the right to pursue a bad faith claim pursuant to § 27-7-2. The appellants further argue that Ms. Bellini has standing to pursue a bad faith action in her own name.

Finally, they assert that the hearing justice erred in her calculation of postjudgment interest; they argue that compound postjudgment interest is appropriate in this case.

### H. Imperial's Arguments on Appeal

For its part, Imperial maintains that Mr. DeSantis, as an assignee, has no common law or statutory bad faith claim; it also maintains that he has no rights to any additional payment because his judgment was satisfied in full. Imperial also argues that Ms. Bellini had no standing to pursue an action in her own name because she had assigned to Mr. DeSantis any claim that she might have had.

With respect to the issue of compound interest, Imperial argues that the virtually identical statutory language governing prejudgment and postjudgment interest and this Court's construction of that statutory language as calling for the imposition of simple interest only, mandates that postjudgment interest also be simple interest. Imperial contends that the hearing justice properly granted summary judgment on all counts.

### Standard of Review

■■■■ This Court conducts a *de novo* review of a hearing justice's decision with respect to a motion for summary judgment. *National Refrigeration, Inc. v. Standen Contracting Co.*, 942 A.2d 968, 971 (R.I.2008). In conducting our review of the grant of a summary judgment motion, "this Court employs the same standard on review as the hearing justice." *Cruz v. City of Providence*, 908 A.2d 405, 406 (R.I.2006) (internal quotation marks omitted). We review the evidence in the light most favorable to the nonmoving party; we will affirm the grant of summary judgment if we determine that no genuine issue of material fact exists and that the

moving party is entitled to judgment as a matter of law. *Id.*

### Analysis

### A. The Bad Faith Claim

### 1. The *Mello* Precedent

■ Because this Court's decision in *Mello v. General Insurance Company of America,* 525 A.2d 1304 (R.I.1987) was cited by the hearing justice in this case as not being applicable to the assignment at issue, we pause briefly to examine that case—although ultimately we shall not have to decide whether its principles would extend to the instant factual context.

In *Mello,* this Court analyzed the issue of whether or not a claim for bad faith against an insurer is assignable. In that case, the plaintiff appealed from the Superior Court's grant of summary judgment in favor of an insurance company on the grounds that an insured's bad faith claim against its insurer is not assignable. *Mello,* 525 A.2d at 1305.

The plaintiff in *Mello* had been struck on the premises of a car wash business insured by the defendant. *Mello,* 525 A.2d at 1305. After settlement negotiations proved to be unavailing,[5] a trial was held, at the conclusion of which a verdict was rendered in the plaintiff's favor against the car wash business. *Id.* The insurance company for the business paid the plaintiff an amount up to the policy limits, but it refused to pay the part of the judgment that exceeded that amount. *Id.* The car wash business then assigned to the plaintiff its claim against the insurance company for its alleged bad faith failure to settle the claim within the policy limits; in exchange, the plaintiff agreed not to levy execution against the car wash business

for the unsatisfied part of the judgment. *Id.*

This Court in *Mello* proceeded to analyze the statute governing direct actions against an insurer (§ 9–1–33) in order to determine whether or not an insured's right to proceed against an insurer can be assignable. *Mello,* 525 A.2d at 1305. After reviewing its previous holdings in *Etheridge v. Atlantic Mutual Insurance Co.,* 480 A.2d 1341, 1345 (R.I.1984) and *Hospital Service Corp. v. Pennsylvania Insurance Co.,* 101 R.I. 708, 712, 227 A.2d 105, 109 (1967), this Court arrived at the following conclusion:

> "While we do not advocate a general policy of allowing assignment of the right to sue an insurance company for bad faith, we are convinced that *in certain limited circumstances* the insured's right may be assigned. The facts of the case at bar constitute such limited circumstance." *Mello,* 525 A.2d at 1306. (Emphasis added.)

In explaining its reasons for so holding, this Court reviewed the bad faith conduct of the defendant insurance company: the plaintiff twice had offered to settle her claim against the car wash business within the limits of the insurance policy, but the insurance company rejected both offers, and the case proceeded to a jury trial. *Mello,* 525 A.2d at 1306. At the conclusion of that jury trial, the jury awarded the plaintiff a judgment in the amount of $224,254.11, which was more than twice the amount of the policy limit. *Id.* Subsequently, the insurance company paid the plaintiff the judgment up to the policy limit ($100,000), and the plaintiff then was required to seek the remainder of the judgment from the insured. *Id.* The plaintiff

---

**5.** As we discuss more fully *infra,* during those settlement negotiations the plaintiff twice offered to settle within the policy limits.

and the insured then reached a settlement agreement whereby the insured assigned to the plaintiff the insured's right to sue the insurance company directly.[6] *Id.*

In view of the facts in that case, this Court in *Mello* held that the assignment was legally permissible. *Mello,* 525 A.2d at 1306. The following is a summary of this Court's holding in that case:

"We therefore hold that an insured may assign its bad-faith claim against its insurer to the injured claimant for the limited purpose of recovering the difference between the judgment received against the insured and the insurance-policy limits." *Id.*

It is clear that the actual holding in *Mello* was starkly limited; this Court in that case addressed only the availability of an assignment of a bad faith claim against the background of the factual circumstances that the *Mello* case presented: an insurer had refused to settle the case within the limits of the policy and, subsequently, the plaintiff was awarded a judgment in excess of that policy amount, with the insured thereafter assigning to the plaintiff its bad faith claim against the insurer. The case before us, however, presents a radically different set of facts.

## 2. Bad Faith *Vel Non* in this Case

█ We have stated that bad faith "is established when the proof demonstrates that the insurer denied coverage or refused payment without a reasonable basis in fact or law for the denial." *Skaling v. Aetna Insurance Co.,* 799 A.2d 997, 1010 (R.I.2002). The standard that this Court employs in making that determination is the "fairly debatable" standard. According to that standard, an insurer "is entitled to debate a claim that is fairly debatable." *Id.* at 1011. That inquiry turns on "whether there is sufficient evidence from which reasonable [minds] could conclude that in the investigation, evaluation, and processing of the claim, the insurer acted unreasonably and either knew or was conscious of the fact that its conduct was unreasonable." *Id.* (Internal quotation marks omitted.) This Court went on to "reiterate" that not every instance where an insurance company refuses to pay constitutes bad faith. *Id.* at 1012. Rather, we observed:

"A plaintiff must demonstrate an absence of a reasonable basis in law or fact for denying the claim or an intentional or reckless failure to properly investigate the claim and subject the result to cognitive evaluation." *Id.*

In the instant case, we need not and do not address the issue of whether or not bad faith claims were assignable to Mr. DeSantis because, in our estimation, the conduct of Imperial did not rise to the level of bad faith. Giving considerable weight to the fact that there was a fully understandable and not at all frivolous debate as to whether or not the property was covered by the pertinent insurance policy (*see Imperial Casualty and Indemnity Co. v. Bellini,* 888 A.2d 957 (R.I.2005)), we simply cannot say that it was demonstrated that there was "an absence of a reasonable basis in law or fact for denying the claim" or that it was proven that the insurer intentionally or recklessly failed to properly investigate the claim. *Skaling,*

---

**6.** This sort of transaction has been described as one wherein "the aggrieved policyholder assigns his bad-faith tort action to the injured party [and the] third-party victim agrees to sue the insurer directly for the excess judgment and to release the insured from liability." Willy E. Rice, *Judicial Bias, the Insurance Industry and Consumer Protection: An Empirical Analysis of State Supreme Courts' Bad–Faith, Breach–of–Contract, Breach–of–Covenant–of–Good–Faith and Excess–Judgment Decisions, 1900–1991,* 41 Cath. U.L.Rev. 325, 344 (1992).

799 A.2d at 1012. Accordingly, Imperial's position easily meets the "fairly debatable" standard, pursuant to which an insurer is entitled to dispute a claim when it is "fairly debatable." *See id.* at 1011.

We would further observe that the sheer duration of the litigation in this case constitutes another indicator that Imperial's conduct in this case did not constitute bad faith. This case has been litigated over several years, and it was not often allowed to lie fallow. As we described this case in an earlier incarnation of the litigation, it has an "extensive and somewhat muddied factual and procedural history—as well as witnesses scattered to the four winds, with varying levels of recollection of the events at hand * * *." *Imperial Casualty and Indemnity Co.*, 888 A.2d at 964. The complex—and protracted—history of the case indicates to us that the "fairly debatable" issue of insurance coverage gave rise to a great deal of litigation, but we detect no bad faith on the part of the insurer.

For these reasons, we uphold the hearing justice's grant of summary judgment dismissing the bad faith claims against Imperial.

## B. The Calculation of Interest

■ This Court has repeatedly stated that it disfavors compounding interest on monetary awards in a judgment unless the General Assembly has specifically authorized such compounding. *DiLuglio v. Providence Auto Body, Inc.*, 755 A.2d 757, 775

(R.I.2000); *Clark–Fitzpatrick, Inc./Franki Foundation Co. v. Gill*, 652 A.2d 440, 451 (R.I.1994); *Welsh Manufacturing, Division of Textron, Inc. v. Pinkerton's, Inc.*, 494 A.2d 897, 897–98 (R.I.1985).[7]

We have previously observed that, "because the right to receive interest on judgments was unknown at common law as it is a right created by statute, the court will strictly construe any statute that awards interest on judgments so as not to extend unduly the changes enacted by the legislature." *Clark–Fitzpatrick, Inc.*, 652 A.2d at 451 (quoting *Gott v. Norberg*, 417 A.2d 1352, 1357 (R.I.1980)); *see also Bogosian v. Woloohojian*, 158 F.3d 1, 8 (1st Cir. 1998).

Although this Court has not previously had the opportunity to analyze the possibility of compounding postjudgment interest, we have addressed the proposal of awarding compound prejudgment interest on a number of occasions. *See, e.g., DiLuglio*, 755 A.2d at 775; *Clark–Fitzpatrick, Inc.*, 652 A.2d at 451; *Welsh Manufacturing, Division of Textron, Inc.*, 494 A.2d at 897–98. As the hearing justice observed in this case, this Court has always interpreted the prejudgment interest statute as referring to simple—not compound—interest, and the virtually identical statutory language[8] governing prejudgment and postjudgment interest mandates that we treat similarly the calculation of both.[9] Accordingly, she ruled that post-

---

7. It is worth noting that, in G.L.1956 § 42–11.1–6(e), the General Assembly has *specifically* mandated that overdue unpaid interest due to a contractor by the Department of Administration shall be compounded monthly. Other statutes specifically mandate that compound interest be employed with respect to certain municipal retirement plans. *See, e.g.,* G.L.1956 §§ 45–21–2(14); 45–21–9(b).

Such a specific authorization is notably absent from § 9–21–10(a), the statute governing postjudgment interest.

8. *See* note 2, *supra.*

9. *See State v. DiStefano*, 764 A.2d 1156, 1161 (R.I.2000) (noting that "the meaning of questionable or doubtful words or phrases in a statute may be ascertained by reference to the meaning of other words or phrases associated with it") (quoting Black's Law Dictionary 1060 (6th ed.1990)); *see also Jones v. United States*, 527 U.S. 373, 389, 119 S.Ct. 2090, 144 L.Ed.2d 370 (1999) ("Statutory language must be read in context and a phrase gathers

judgment interest in this case would be calculated as simple interest, not compound. We wholeheartedly agree with that ruling.

As set forth earlier in this opinion,[10] the statute governing the calculation of postjudgment interest, § 9–21–10(a), stipulates that interest, at the rate of "twelve percent (12%) per annum," shall accrue on both the principal and the prejudgment interest. Similarly, the language governing the calculation of prejudgment interest specifies that prejudgment interest shall accrue "at the rate of twelve percent (12%) per annum." Section 9–21–10(a). In light of the identical statutory language that the General Assembly chose to describe how prejudgment and postjudgment interest shall accrue, appellants' contention that "the term 'per annum' indicates compounding" quite simply is not availing.

We decline the invitation of the appellants to abandon what they characterize as our society's "bias" against interest.[11] We have given due consideration to the appellants' entreaty that the method of calculating postjudgment interest should be altered so that such interest would be calculated on a compound basis. After considering the issue, however, we can perceive absolutely no reason why we should deviate from our long-standing preference for simple interest rather than compound interest on damage awards, except when there is a specific statutory mandate to the contrary.[12]

## Conclusion

For the reasons set forth in this opinion, we uphold the Superior Court's judgment in this protracted case. At this juncture, we pause briefly to observe that the "[appellants] have had their day in court—and then some. The time has come for this litigation to end." *Northern Trust Co. v. Zoning Board of Review of Westerly*, 899 A.2d 517, 520 (R.I.2006); *see also Palazzo v. Alves*, 944 A.2d 144, 155 (R.I.2008) ("There is nothing more to be said; this case is over."); *Ryan v. Roman Catholic Bishop of Providence*, 941 A.2d 174, 188 (R.I.2008); *Arena v. City of Providence*, 919 A.2d 379, 396 (R.I.2007).

The papers in the case may be remanded to the Superior Court.

---

meaning from the words around it.") (internal quotation marks omitted); *Chambers v. Ormiston*, 935 A.2d 956, 964 (R.I.2007).

**10.** *See note 2, supra.*

**11.** In the same vein, counsel for appellants asserts in his memorandum:

"There was in early Christendom a belief that the calculation and assessment of interest was itself immoral, a belief which still prevails in Islam. That bias no doubt permeated the original reaction of law to the very concept of interest. It is time to abandon that bias. To allow the compounding of post judgment interest in this case would result in rates still significantly lower than those borne by the average credit card debt-or. There is simply no reason not to compound post judgment interest * * *."

Without commenting on the historical accuracy *vel non* of the just-quoted assertion, we note that it deals with a question of general societal policy—a matter that should be addressed in a legislative rather than a judicial forum. *See Chambers*, 935 A.2d at 966–67.

**12.** Many other state courts disfavor the use of compound interest. *See* 1 Dan B. Dobbs, *Law of Remedies*, § 3.6(4) at 353 (2d ed.1993) (citing cases and noting that "[t]he traditional rule is that in computing prejudgment interest, at whatever rate, the interest is not to be compounded").