Miller v. NH Dept. of Corrections     CV-99-522-M     11/13/01
UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE


Robert Miller,
        Plaintiff

        v.                                    Civil No. 99-522-M
                                              Opinion No. 2001 DNH 208
New Hampshire Department of
Corrections,
        Defendant


**O R D E R**

In this suit, plaintiff asserts that he has been retaliated against for engaging in protected conduct, in violation of Title VII of the Civil Rights act of 1964, 42 U.S.C. §§ 2000e, et seq. Specifically, he alleges that he was disciplined, denied promotions for which he was qualified, and constructively discharged from his position at the New Hampshire State Prison ("NHSP"), all in retaliation for supporting one of his subordinates in a sexual harassment claim. Before the court are defendant's motion for summary judgment (document no. 18), to which plaintiff objects, and defendant's motion to strike the

affidavit submitted in support of plaintiff's objection to summary judgment (document no. 21).

For the reasons given below, defendant's motion to strike is denied, and defendant's motion for summary judgment is granted.

**Defendant's Motion to Strike**

Defendant asks the court to strike the affidavit of plaintiff Robert Miller, in its entirety, because it is unsigned. Defendant also asks the court to strike specific portions of the affidavit because they contain hearsay, are insufficiently specific, or are argumentative, conclusory, or speculative. Plaintiff has since filed an executed signature page, which cures the first deficiency identified by defendant. As to defendant's remaining complaints, the court will give the affidavit what credence is due, in light of the rules pertaining to the content of affidavits. On that basis, defendant's motion to strike plaintiff's affidavit is denied.

2

**Defendant's Motion for Summary Judgment**

I.   Standard of Review

Summary judgment is appropriate when the record reveals "no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law."  FED. R. CIV. P. 56(c).  "To determine whether these criteria have been met, a court must pierce the boilerplate of the pleadings and carefully review the parties' submissions to ascertain whether they reveal a trialworthy issue as to any material fact."  Perez v. Volvo Car Corp., 247 F.3d 303, 310 (1st Cir. 2001) (citing Grant's Dairy-Me., LLC v. Comm'r of Me. Dep't of Agric., Food & Rural Res., 232 F.3d 8, 14 (1st Cir. 2000)).

> Not every factual dispute is sufficient to thwart
> summary judgment; the contested fact must be "material"
> and the dispute over it must be "genuine."  In this
> regard, "material" means that a contested fact has the
> potential to change the outcome of the suit under the
> governing law if the dispute over it is resolved
> favorably to the nonmovant.  By like token, "genuine"
> means that the evidence about the fact is such that a
> reasonable jury could resolve the point in favor of the
> nonmoving party.

Navarro v. Pfizer Corp., 261 F.3d 90, 93-94 (1st Cir. 2001) (quoting McCarthy v. Northwest Airlines, Inc., 56 F.3d 313, 315 (1st Cir. 1995)).

In defending against a motion for summary judgment, "[t]he non-movant may not rely on allegations in its pleadings, but must set forth specific facts indicating a genuine issue for trial." Geffon v. Micrion Corp., 249 F.3d 29, 34 (1st Cir. 2001) (citing Lucia v. Prospect St. High Income Portfolio, Inc., 36 F.3d 170, 174 (1st Cir. 1994)). When ruling upon a party's motion for summary judgment, the court must "scrutinize the summary judgment record 'in the light most hospitable to the party opposing summary judgment, indulging all reasonable inferences in that party's favor.'" Navarro, 261 F.3d at 94 (quoting Griggs-Ryan v. Smith, 904 F.2d 112, 115 (1st Cir. 1990)).

II.  Factual Background

The nature of plaintiff's complaint and pleadings are such that a detailed review of the pertinent factual background,

4

though unavoidably lengthy, will likely prove helpful in putting the legal issues in context.

Plaintiff was hired by the New Hampshire Department of Corrections ("DOC") in 1986 to fill the position of "Corrections Unit Manager II" at NHSP.  (Def.'s Mot. Summ. J., Ex. 1 (hereinafter "Currier Aff.") ¶ 5A.)  In 1988, DOC adopted a policy of periodically rotating unit managers from one unit to another.  (Def.'s Mot. Summ. J., Ex. 14 (hereinafter "Cunningham Aff.") ¶ 4; Ex. 20 ("As part of the unit management system, we have agreed with the Department of Personnel to rotate Unit Managers through the various units.").)

In 1989, plaintiff was transferred to the position of unit manager of the Shock Incarceration Unit.  (Currier Aff. ¶ 5B.) He applied for the transfer, and earned the fourth highest overall score out of seven applicants, but was awarded the transfer based upon earning the highest score on the oral

5

interview.[1]  (Id.; Def.'s Mot. Summ. J., Ex. 3.)  In 1991, plaintiff applied for a promotion to the position of Major but was turned down.  (Currier Aff. ¶ 5C; Def.'s Mot. Summ. J., Ex. 4.)  In 1992, he applied for a probation and parole officer ("PPO") position, but was not certified because he lacked the requisite degree.  (Currier Aff. ¶ 5D; Def.'s Mot. Summ. J., Ex. 5.)

In January 1991, Michael Cunningham ("Cunningham"), Warden of NHSP, transferred plaintiff out of the Shock Incarceration Unit because plaintiff: (1) was unable to get along with the unit's PPO (Cunningham Aff. ¶ 5); (2) failed to follow instructions concerning the discipline of a prisoner (id.); and

---

[1] The DOC uses two methods to rank job applicants, one for job searches targeting internal candidates, the other for searches targeting outside candidates.  (Currier Aff. ¶ 4.) Applicants responding to outside job postings are scored based upon structured interviews.  (Id.)  Applicants responding to inside postings are scored on both the structured interview and a series of "factors" such as seniority.  (Id.)  The interview scores and the "factor" scores are added to yield an "overall" score for those seeking positions that have been posted internally.  (Id.)

(3) was the subject of a complaint that he had verbally abused a prisoner (id.; Def.'s Mot. Summ. J., Exs. 22 & 23). As a result of his "failure to follow explicit instructions from [his] superior," plaintiff was issued a formal letter of warning from Cunningham dated February 4, 1991. (Def.'s Mot. Summ. J., Ex. 21.)

In his 1988 performance evaluation, plaintiff received no marks in the "unsatisfactory," "poor," or "fair" categories, received six marks in the "average" category, twenty-seven in the "good" category, four in the "excellent" category, and received none in the "superior" category. (Def.'s Mot. Summ. J., Ex. 15.) He was rated as "especially good" at "organizational tasks and pro-active planning," and was found to "need[] more work" in "resolving interpersonal conflicts in the course of daily operations." (Id.) The evaluator concluded by noting: "Mr. Miller is a very conscientious individual. He has been an important asset and meaningful contributor to many Division and Bureau activities and programs." (Id.) Plaintiff's performance

7

evaluation for 1990 indicates that he met expectations in all twenty-three categories that were rated (Def.'s Mot. Summ. J., Ex. 16), and beside two check marks, the evaluator added the notation "excellent" (id.).

Plaintiff's 1991 performance evaluation was conducted on February 5, the day after he received the formal letter of warning for failing to follow instructions. (Def.'s Mot. Summ. J., Ex. 17.) In that evaluation, plaintiff was found to meet expectations overall, and in twenty-six of twenty-eight rated categories. (Id.) The evaluator also noted plaintiff's difficulties with the PPO, his lapses of judgment, and his failure to use the chain of command. (Id.) The next year, in his 1992 performance evaluation, plaintiff was found to meet expectations in all twenty-eight categories, was praised for overcoming the problems of the previous year, but was told that he needed to continue to work on his interpersonal communication skills. (Def.'s Mot. Summ. J., Ex. 19.)

By the summer of 1995, plaintiff was managing the Hancock Unit ("Hancock"). Among his subordinates were Corrections Officers Sherri White ("White"), who worked on the first shift, and Tab Colby ("Colby"), who worked on the second shift. During the course of his management of Hancock, plaintiff once called Colby a pathological liar in front of other correctional officers. (Def.'s Mot. Summ. J., Ex. 25 (hereinafter "Miller Dep.") at 23.) At some point during the summer or fall of 1995, plaintiff learned, from a third party, that two members of the second shift, Colby and Corrections Sergeant Bruce Ciccone ("Ciccone"), had made derogatory comments to the effect that White had had sexual contact with inmate Gary York. When plaintiff learned of the comments attributed to Colby and Ciccone, he told White about them (Miller Dep. at 79), and arranged for White to meet with: (1) DOC's Personnel Bureau, which is charged with investigating claims of sexual harassment; and (2) an attorney.

9

On November 3, 1995, White filed a formal complaint of sexual harassment with the Personnel Bureau. (Def.'s Mot. Summ. J., Ex. 12.) Her complaint included twelve separate allegations (id.; Def.'s Mot. Summ. J., Ex. 13 at Bates stamp 378), one of which stated: "I have heard rumors of second shift saying I was having oral sex with inmate York . . ." (Def.'s Mot. Summ. J., Ex. 12 at 5 of 6 (Bates stamp 452)). The Personnel Bureau's Discrimination Review Committee ("DRC") recommended that White's complaint be investigated. (Def.'s Mot. Summ. J., Ex. 13 at Bates stamp 378.)

By memorandum dated November 15, 1995, DOC's Administrator of Security, Richard Gerry, and Major Joseph Guimond informed Warden Cunningham that:

> Recently it has come to our attention that we have serious personnel problems in the Hancock Building. We have met with both first and second shift staff outside of the unit and have received essentially the same complaints from both shifts. It is obvious to us that there is a definite lack of confidence in the management of this unit. The officers feel frustrated with what they perceive as a lack of communication between the unit team and themselves. They also are

> concerned with indecisiveness, lack of action, and favoritism on the part of management within the unit.
>
> . . . Our discussions with the staff indicated a desire to continue to work in this unit, but they unanimously voiced a need for a change in the management style in the unit.

(Def.'s Mot. Summ. J., Ex. 24.) The memorandum went on to recommend that plaintiff be transferred from Hancock to the Reception and Diagnostic Unit (R&D). (Id.)

In December 1995, plaintiff was transferred from Hancock to R&D. (Cunningham Aff. ¶ 8.) He also received a negative management appraisal profile ("MAP") from Warden Cunningham. (Pl.'s Obj. to Def.'s Mot. Summ. J., Ex. 1 (hereinafter "Miller Aff.") ¶ 1(14b).) In January 1996, Cunningham met with plaintiff and told him that he would be receiving a poor performance evaluation, based upon his management problems at Hancock. (Id.) In early 1996, plaintiff learned of a rumor that he had been fired. (Miller Aff. ¶ 1(14c).) Believing that the rumor was in retaliation for his support of White, plaintiff complained to

11

Cunningham. (Id.) Cunningham did not investigate the rumor or act on plaintiff's complaint. (Id.)

Based upon the DRC's recommendation, the Personnel Bureau conducted a formal investigation of White's harassment complaint[2] and in the process interviewed seventeen co-employees. (Def.'s Mot. Summ. J., Ex. 13 at Bates stamp 373, 378.) The investigators issued a report on February 12, 1996, finding one of Miller's twelve allegations to be substantiated: her claim to have heard rumors that members of the second shift had accused her of having oral sex with an inmate. (Id. at Bates stamp 379.) The report concluded by stating: "In final summary and conclusion, the fact that the chain of command broke down in H-Building [Hancock], the perceived favoritism of Officer White by fellow officers and the sexual remarks and innuendos made,

---

[2] The assigned investigators were Lisa Currier ("Currier"), DOC's Human Resource Administrator, and George Liouzis ("Liouzis"), Human Resource Administrator for the New Hampshire Liquor Commission. (Def.'s Mot. Summ. J., Ex. 13 at Bates stamp 373.)

created an intimidating and hostile work environment."  (Id. at

Bates stamp 380.)


    To accompany the investigators' report, Currier prepared a

memorandum to Paul Brodeur ("Brodeur"), Commissioner of DOC, also

dated February 12, 1996, providing further details of the DRC's

investigation.  (Id.)  Currier's memorandum stated, inter alia:

> This investigation addressed violations of the NH State
> policy on Sexual Harassment and considered many issues
> which caused the hostile work environment.
>
> Staff were concerned about several performance issues
> in the unit and brought their concerns to the Unit
> Manager, Robert Miller.  Mr. Miller had an open door
> policy which allowed employees to bypass the chain of
> command which many staff felt Ms. White was being shown
> favoritism. . . .  Robert Miller felt Officer White was
> performing this role [as a direct supervision officer
> or "DSO"] in an exemplary capacity.  He praised her
> openly to all the staff members as the best DSO and
> stated to his staff that all could learn from her
> example.
>
> . . . .
>
> . . .  [H]e [plaintiff] openly criticized Officer Tab
> Colby to members of his staff and even referred to
> Officer Colby as a pathological liar.  This practice of
> discussing employees in an open forum is very

13

questionable as proper management behavior and does nothing but cause dissention [sic] in the ranks.

. . . .

Shift bashing was prevalent in H-Building.  With proper leadership, up and down the chain of command, this common rivalry can be kept on a professional level. Openly criticizing Officer Colby of the second shift is unwarranted, unfair to Officer Colby, unprofessional on the part of the Unit Manager [plaintiff] and unfair to Sgt. Ciccone who was Officer Colbys [sic] immediate supervisor.

. . . .

These problems could have been resolved rather quickly and effectively with proper leadership and had those involved taken the responsibilities of their position this situation could have been managed without causing a hostile work environment.

Once again, we find that the Chain of Command was ineffective or was ignored which allowed employees to act independently which replaced the Chain of Command. Frustrations [over plaintiff's seeming inattention to the issue of how much time White spent alone with certain inmates] led to rumors and innuendoes creating an uncomfortable environment for several people.

Unfortunately the person who received the brunt of the negativity was Sherri White.  Staff through their observations and hearing inmates talk did not try to dispel concerns, but talked amongst themselves providing innuendos [sic] which perpetuated rumors.

All of the above observations and comments made to these investigators point out that the work environment

14

became intimidating and hostile for Sherri White caused by inappropriate behavior by fellow workers and unprofessionalism of supervisors.

(Def.'s Mot. Summ. J., Ex. 13 at Bates stamp 374, 376.)

Currier's memorandum concluded with the following recommendation:

Disciplinary action is warranted.

Upon review of circumstances, it is recommended that Robert Miller, Corrections Unit Manager receive disciplinary action for his poor judgment in his interactions with subordinate staff and his lack of leadership in directing his employees in maintaining professionalism in respecting their fellow co-workers.

Disciplinary action is warranted for two other employees due to the credibility concerns regarding the testimony by Corrections Officer Tab Colby (now Corrections Corporal) and Corrections Sergeant Bruce Ciccone. This is due to the fact that two others reported that they directly heard Tab Colby and Bruce Ciccone make sexual remarks about Sherri White, both Tab Colby and Bruce Ciccone deny making any such comments or inferring remarks of a sexual nature about Sherri White.

(Id. at Bates stamp 377.) Plaintiff was not provided with a copy of the DRC's report or Currier's memorandum at the time they were prepared and sent to Brodeur, and did not learn that the credibility of Colby and Ciccone had been called into question by

15

the investigators until January 1999, when he heard testimony offered by Liouzis and Cunningham at the trial of White's sexual harassment suit against DOC.  (Miller Dep. at 82.)

On March 5, 1996, plaintiff received his annual performance evaluation from Warden Cunningham.  (Def.'s Mot. Summ. J., Ex. 19.)  Plaintiff's performance was rated "below expectations" in thirteen of twenty-eight categories and "meets expectations" in the other fifteen.  (Id.)  In addition, his overall performance was rated "below expectations."  (Id. at Bates stamp 354.) Qualitatively, the evaluation form contained the following comments:

ATTENDANCE

> Needs improvement[.]

QUANTITY OF WORK

> Hard worker.

QUALITY OF WORK

> Investigation found that there was a hostile work
> environment in your area of supervision.

16

COMMUNICATIONS

   See comment under leadership.

JOB KNOWLEDGE

   Has signed up for the Certified Public Manager
   Program.

DEPENDABILITY

   Gave confidential information to an employee.

COOPERATION

   Volunteers for additional assignments and produces
   a generally good product.

INITIATIVE

   Offered excuses for high incident rate in unit.

SAFETY

   High incident rate of assaults and fights.

APPEARANCE

   Always well dressed.

LEADERSHIP

   Investigation found that your team was split and
   bashed each other and that you took sides in
   conflicts.

17

OVERALL SUMMARY OF PERFORMANCE

> You did not perform to your usual level this past year. There are two areas of your performance which you must take immediate action to correct:
> - Do not take sides when conflict arises in your team. You must be an honest broker who searches for facts and who is perceived to be fair and impartial by team members. This was not the case in your unit.
> - You must regain your commitment to excellence and accept unconditional responsibility for your team's performance. When problems occur, find ways to solve them. You, too often, did not do this, offering the excuse that since you had the "Lawrence and Lowell inmates" I should not expect excellence. Change this attitude to one of "If there is a problem in my area, I can solve it."
>
> All things considered, you did not meet my expectations this year. We will discuss your progress in the areas cited in this evaluation in September 1996. I will render an evaluation of your performance at that time. I stand ready to work with you and am confident that you can again perform at a high level.

(Def.'s Mot. Summ. J., Ex. 19.)

On March 6, 1996, plaintiff was issued a formal letter of warning by Brodeur. In that letter, Brodeur criticized plaintiff for informing White of the rumor being spread by Colby and

18

Ciccone. (Def.'s Mot. Summ. J., Ex. 34.) Brodeur further

stated:

>    You failed to stop the offensive environment prior to
>    the events that led up to the formal complaint.
>    Through witness testimony, the investigators found that
>    you showed favoritism to the female officer and failed
>    to enforce the chain-of-command when addressing
>    performance concerns and failed to direct your
>    employees in maintaining their professionalism and
>    respecting their fellow co-workers in the work place.
>
>    . . . Your poor judgement in dealing with your
>    subordinate staff impacted the effective operations of
>    the Unit and created dissention [sic], shift bashing
>    and jealousy amongst staff; resulting in sexual rumors
>    and innuendos about a fellow co-worker.

(Id.)


By memorandum to Brodeur dated March 20, 1996, plaintiff

appealed the March 6 letter of warning, pursuant to N.H. CODE

ADMIN. R. Per. 202.01. (Def.'s Mot. Summ. J., Ex. 35.) In his

memorandum, plaintiff stated:

>    I submit to you that I am being used as a scapegoat and
>    being retaliated against because I reported the
>    misconduct, mishandling of the investigation and
>    continued pollution of the environment. A recent

19

standing ovation orchestrated for a sexual harassment perpetrator at our formal briefing, conducted by a DRC member, is certainly evidence of this pollution. I have not seen or heard of such a welcome for staff returning from major surgery. This is sick. Who is responsible? I have requested an outside investigation to be conducted by the Attorney General's office due to this pollution.

(Id. at 3 (emphasis added).)

By memorandum to Brodeur dated May 1, 1996, plaintiff renewed his appeal of the letter of warning. (Def.'s Mot. Summ. J., Ex. 33.) In that second memorandum, which was written in response to an April 29, 1996 meeting between himself and Brodeur, plaintiff stated:

As I stated at our meeting, I feel abused and retaliated against. I am willing to work with you to prevent future occurrences of such hostility but want my record cleared. You agreed that my evaluation and management appraisal (MAP) were done in anger and did not take into consideration my performance for the entire year.

I am willing to drop my appeal if: 1. The letter of warning is removed from my file; 2. A new MAP is completed; 3. I have a new evaluation that is consistent with my performance.

20

. . . .

At this point, <u>I am again asking for a thorough investigation of the environment and retaliation</u>.

(<u>Id.</u> at 1 (emphasis added).)

By letter dated August 8, 1996, Brodeur informed plaintiff that his MAP had been redone and that his performance evaluation would be redone in September, leaving the letter of warning as the only outstanding issue. (Def.'s Mot. Summ. J., Ex. 36.) Brodeur denied plaintiff's appeal of the letter of warning, explaining:

> You admitted that you allowed a situation to exist in your Unit where a female officer complained that she was being harassed. I find it incomprehensible that you were the one who told her she was being harassed. Up until that time, she was unaware of any rancor toward her. You told me that if you had it to do all over again, you would still tell her about what others were saying. You even mentioned that an officer was stalking her, which the investigation disproved. You then jumped the chain of command and took this alleged victim as well as another employee to an attorney because the institutional investigation "was not moving fast enough".

21

You admitted that your staff complained that this female officer was spending too much time with one inmate (a convicted murderer). You acknowledged that you warned her but she persisted in spending excessive time with this same inmate. And yet, you perceived nothing wrong with her behavior or attitude although experienced officers continued to warn you.

. . . You allowed a situation to exist and to continue in your Unit where staff on one shift were carping on staff on another shift. And what really concerns me is that you do not believe or will not really acknowledge that if you had managed the situation correctly, none of this would have happened.

. . . You still do not see the error in [the] way you handled the situation, including spreading the rumors to the female corrections officer. I believe, for whatever reason, you took sides. As a result, you became part of the problem.

(Id.) Plaintiff responded to Brodeur's denial by letter dated August 13, 1996, in which he disagreed with Brodeur's analysis of the situation. (Def.'s Mot. Summ. J., Ex. 37.) In that letter, plaintiff restated his request for a thorough investigation of "environmental pollution" at NHSP. (Id.) However, at some point after Brodeur denied the appeal, plaintiff learned that White had lied to him, and, as a result, he did not take the next step in

22

the appeal process – taking the matter to the Personnel Appeals

Board.   (Miller Dep. at 68-69.)


According to plaintiff's deposition testimony, he was

treated well from August 1996 until sometime in late 1998.  In

plaintiff's own words:


> As a matter of fact, I was treated very well up until I
> found out about Ciccone and Colby lying, and that was
> kept from me.  I found out right in the federal
> courthouse.[3]  I was in shock when I found out that they
> lied and no one told me.
>
> .  .  .  .
>
> So to be honest, I believe I was retaliated
> [against] in the early stages, they treated me golden,
> and then they treated me like a bum when I found out
> about the truth of the lying in court.
>
> .  .  .  .

---

[3] Plaintiff was a witness in White's Title VII trial in
January 1999, and he claims to have offered testimony that was
supportive of White's position against DOC.   (Miller Aff. ¶
1(9).)   While in court, plaintiff heard the testimony of Liouzis
and Cunningham, which established that Colby and Ciccone had lied
to the investigators assigned by the Personnel Bureau to White's
internal sexual harassment complaint.   (Pl.'s Obj., Ex. C.)

> . . . They treated me golden when I stopped my appeal,
> and they resumed mistreating me again when we walked
> out of court in Sherri White's case and I made an issue
> out of them not informing me that two of my employees
> lied to investigations [sic].

(Miller Dep. at 80, 82 & 83; <u>see also</u> Miller Dep. at 105.)

By memorandum to plaintiff dated February 26, 1998, Cunningham revised plaintiff's 1996 performance evaluation as follows:

> I have reviewed again your 3/5/96 Performance Summary.
> Information came to light after the evaluation. Sherry
> [sic] White had been untruthful to you and you acted on
> this information. You did not act with any malice of
> forethought. Had you been given accurate information
> from all parties, you would have responded differently
> to the events I focused on in my evaluation.
>
> Based on the foregoing I am changing your evaluation
> from "Below Expectations" to "Met Expectations."

(Def.'s Mot. Summ. J., Ex. 19 at Bates stamp 355.)

By memorandum dated April 23, 1998, plaintiff asked Henry Risley ("Risley"), the new Commissioner of DOC, to remove the

24

March 6, 1996 letter of warning from his file. (Pl.'s Obj., Ex. B.) The basis for plaintiff's request was "information [he] received on 23 March 1998 in the decision rendered by the workers' compensation appeals board." (Id.) While plaintiff's memorandum does not indicate whose workers' compensation case generated the decision to which he refers, and while it is not clear precisely what information he gleaned from that decision, it would appear that plaintiff was referring to negative information about White. (Id. ("I can assure you that if I had known what I read in the 13 [sic] March 1998 workers' compensation appeals board decision I not only wouldn't have believed Sherri White, I also wouldn't have employed her to take out my garbage.").) Plaintiff also stated his belief that he had been retaliated against in 1996 for supporting White's sexual harassment claim. (Id.) Risley declined to remove the letter of warning from plaintiff's file.

During the fall of 1998, plaintiff applied for the position of "Supervisor VII, Internal Affairs." (Def.'s Mot. Summ. J.,

25

Ex. 1 (Currier Aff.) ¶ 5F.) For reasons that are unclear, plaintiff bypassed the internal application process and instead submitted his application in response to the public advertisement. (Id.) Even so, defendant considered plaintiff's application. However, along with four other applicants, plaintiff failed the structured interview. (Def.'s Mot. Summ. J., Ex. 7.) The three applicants who passed the interview scored 89.2, 85.4, and 81.1, respectively. (Id.) Plaintiff scored 56.7. (Id.) The other applicants who failed the interview scored 66.1, 43.2, 39.8, and 28.4, respectively. (Id.) The position was first offered to the applicant scoring 89.2, who declined, and was ultimately offered to and accepted by the applicant who scored 85.4. (Id.) Plaintiff was notified that he was not selected for the position by letter dated January 21, 1999. (Id.)

Subsequently, plaintiff applied for a PPO position (Currier Aff. ¶ 5G), and was one of thirteen applicants who were interviewed (Currier Aff. ¶ 5G; Def.'s Mot. Summ. J., Ex. 8). Of

26

the thirteen, plaintiff had the highest overall score, but only the third highest score on the oral interview. (Id.; Def.'s Mot. Summ. J., Ex. 9.) The position was offered to the applicant with the highest score on the oral interview, but the eleventh highest overall score.[4] (Currier Aff. ¶ 5G.) Plaintiff was informed that he had not been selected on approximately March 10, 1999. (Id.)[5]

By memorandum to Risley dated February 2, 1999, plaintiff appealed the March 6, 1996, letter of warning a third time. (Pl.'s Mot. Summ. J., Ex. C.) In his memorandum, plaintiff stated:

---

[4] That result appears remarkably similar to plaintiff's obtaining a transfer to the position of Shock Incarceration Unit Manager in 1989. He earned the fourth highest overall score, but the highest score on the oral exam. (Def.'s Mot. Summ. J., Ex. 3.)

[5] Plaintiff also applied for, but did not obtain, two other promotions during the second half of 1988. (Currier Aff. ¶¶ 5E (Acting Warden for the new Northern Correctional [F]acility in Berlin) and 5H (Administrator of Programs for the Northern Correctional [F]acility).) Those applications are not mentioned in plaintiff's amended complaint.

The basis for my appeal is that at the US District Court in Concord on Thursday January 28, 1999, I became aware of information that was kept from me over the past three years. Specifically, I became aware of the fact that, then Sergeant Bruce Ciccone and CO Tab Colby **LIED** during the course of an official investigation concerning CO Sherri White. I became aware of this information by listening to the testimony of Mr. George Louzis [sic] of the NH Liquor Commission who acted as an investigator in the White sexual harassment case. The testimony of Ciccone and Colby lying was confirmed by the testimony of Warden Cunningham.

The essence of my appeal is simple. I was lied to by both the victim and perpetrators of this case and was held responsible for their misconduct. I would never have dropped my appeal if I were made aware of Ciccone and Colby's lack of truthfulness.

What is of great concern to me, and I hope to you, was that both lying perpetrators have since been promoted.
. . .

Secondly, I am informing you that I am filing a retaliation complaint against the Department and yet to be named employees. As you know, I have shared my feelings of mistreatment and retaliation with you on several occasions in the past. It is now formal that I present you with a complaint of retaliation and malfeasance in regard to employees under your control.

As we discussed in your office on Wednesday morning 27 January 1999, I would appreciate you keeping those employees who act maliciously under control to prevent further retaliation. With this in mind, I am informing you that I have informed elected officials of my concerns for retaliation in the future.

28

        . . . .

        . . . As you know, this Department has treated me very
        poorly when I have applied for promotional
        opportunities.  I have never been afforded specifics as
        to why I was not treated to professional courtesy in
        this regard.  The more this mistreatment occurred, the
        more it became obvious to me that qualifications for
        positions were secondary to the need of your agents to
        retaliate against me.

        . . . .


        The hostile work environment I have had to work in has
        caused me medical problems that do not seem to concern
        anyone in your chain of command. . . .  I base this on
        the history of this Administration over my career.
        Every time I have challenged or expressed my rights as
        an employee your headquarters has dispatched them in
        force to create ill will in my area of responsibility.
        . . .

        If you feel it is worth your while to talk with me, I
        would appreciate it.  Please let me know your desires
        as soon as possible as my health is suffering.


(Id.)  Risley did not remove the letter of warning from

plaintiff's personnel file.  At some point during this time

period, plaintiff had an angry conversation with Risley in

Risley's office.  (Miller Dep. at 112 ("I yelled.  I was very

respectful, but I raised my voice.  I didn't use any four-letter

words, but I did raise my voice, absolutely.").)

29

On March 4, 1999, defendant asked plaintiff to have an outside medical examination, to determine his mental fitness to work. By memorandum to Risley dated May 7, 1999, plaintiff resigned from DOC effective May 20. (Def.'s Mot. Summ. J., Ex. 11.)

Based upon the foregoing events, on March 19, 1999, plaintiff filed a charge of discrimination with the New Hampshire Human Rights Commission ("HRC"). (Def.'s Mot. Summ. J., Ex. 38.) That charge was received by the Equal Employment Opportunity Commission ("EEOC") for state/federal dual filing purposes on March 22. (Id.) Plaintiff's charge of discrimination was labeled a claim of retaliation, in violation of Title VII of the Civil Rights Act of 1964. It listed December 1, 1995, as the date of the earliest alleged violation and March 4, 1999, as the date of the most recent alleged violation. (Id.) Specifically, plaintiff claimed that he had been retaliated against "for opposing sexual harassment within the department and for assisting victims of sexual harassment in proceedings under the

30

State's policy against discrimination and under state and federal law." (Id.) The retaliatory conduct listed in plaintiff's HRC/EEOC charge included:

- transferring him from Hancock to R&D in 1995;

- the negative MAP in December 1995;

- orally criticizing him, in January 1996, for his management of Hancock;

- failing to investigate and quash a rumor, circulating in early 1996, that he had been fired;

- the negative performance evaluation on March 5, 1996;

- the March 6, 1996, letter of warning;

- failing to rescind the letter of warning or investigate matters raised in his 1996 appeal of the letter of warning;

- harassing him over petty problems in the R&D unit which predated his tenure as unit manager;

- holding him responsible, in 1996, 1997, and 1988, for the poor performance of subordinates with health issues that interfered with their ability to perform;

- failing to give him several promotions for which he applied in 1998 and 1999 and for which he was better qualified than the candidates selected;

- failing to rescind the letter of warning or respond to his concerns about retaliation, in 1998 and 1999, after he

31

discovered information about White (in the workers'
compensation hearing) and discovered information about
Colby and Ciccone lying to investigators (in White's 1999
trial);

- failing to explain why he had not done well on a recent
  promotion board examination;

- failing to respond to various memoranda;

- requesting, on March 4, 1996, that he have an outside
  medical examination to determine his fitness for duty;

- shunning him at a corrections academy graduation
  ceremony in 1999; and

- failing to provide him with a timely performance
  evaluation in 1999.

(Def.'s Mot. Summ. J., Ex. 38.)


Plaintiff filed this suit on November 3, 1999.  In his

amended complaint, he identifies the following conduct on his

part that caused defendant to retaliate against him:

- notifying White of her right to be free from sexual rumors
  about her that were being spread by Colby and Ciccone;

- notifying his superiors of Colby's and Ciccone's
  harassment of White, and asking them to conduct an
  investigation;

- arranging for White to meet with internal DOC sexual harassment investigators, and with an attorney;

- publically insisting that White's complaint be treated properly by DOC;

- formally asking the Warden, in May 1996, to conduct a thorough investigation of sexual harassment at NHSP and of those who were still harassing White;

- asking the Warden, in August 1996, for a thorough investigation of sexual harassment at NHSP;

- filing internal complaints of retaliation against him in 1996, 1998, and 1999;

- asking the Warden, in 1996, 1998, and 1999, to rescind his letter of warning; and

- testifying at White's trial in federal court, in January 1999, in a manner that was generally favorable to White.

(Pl.'s Am. Compl.)  Plaintiff's complaint asserts that the following acts or events constituted retaliation on the part of defendant:

- transferring him from Hancock to R&D in 1995;

- the negative MAP in December 1995;

- failing to investigate and quash a rumor, circulating in early 1996, that he had been fired;

- the negative performance evaluation on March 5, 1996;

33

- the March 6, 1996 letter of warning;

- failing to rescind the letter of warning when asked to do so in 1996, 1998, and 1999;

- harassing him, in 1996, over petty problems in the R&D unit which predated his tenure as unit manager;

- holding him responsible, in 1996, 1997, and 1998, for the poor performance of subordinates with health issues that interfered with their ability to perform;

- passing him over, in favor of a candidate with lesser qualifications, in January 1999, for a position with the DOC's office of internal affairs;

- passing him over, in favor of a candidate with lesser qualifications, in February 1999, for a position as a PPO;

- failing to respond to a request to investigate his claim of retaliation, made in January 1999, in light of trial testimony establishing that Colby and Ciccone had lied to those investigating White's sexual harassment complaint;

- requesting, in February and March 1999, that he have an outside medical examination to determine his mental fitness for duty;

- failing to provide him with a timely performance evaluation in 1999; and

- denying his request, in mid April 1999, for an extension of time to complete a project, and then failing to transmit the final results up the chain of command for several weeks after he completed it.

## III. <u>Discussion</u>

Defendant moves for summary judgment on grounds that: (1) plaintiff's claim is time-barred; (2) plaintiff has failed to make out a prima facie case of retaliation; (3) plaintiff has failed to meet his burden under the <u>McDonnell Douglas</u> framework; (4) plaintiff was not constructively discharged; and (5) plaintiff's retaliation claim is barred under the rule of <u>Price Waterhouse v. Hopkins</u>, 490 U.S. 227, 242 (1989), because defendant would have taken the same action regardless of any improper motive. Plaintiff counters that he has made a timely claim based upon a continuing violation of Title VII, and that he has made out a prima facie case of retaliation sufficient to survive summary judgment. In the discussion that follows, the court addresses those arguments raised by defendant that are pertinent to its ruling.

Under Title VII of the Civil Rights Act of 1964 (as amended):

It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3(a).


A.   Timeliness

Discrimination claims brought under Title VII are subject to "an exhaustion requirement coupled with a short statute of limitations," Clockedile v. N.H. Dep't of Corr., 245 F.3d, 1, 3-4 (1st Cir. 2001) (citing Zipes v. Trans World Airlines, Inc., 455 U.S. 385, 393-95 (1982)), under which "a charge 'shall be filed' with the EEOC 'within one hundred and eighty days after the alleged unlawful employment practice occurred,' or within 300 days if 'the person aggrieved has initially instituted proceedings with [an authorized] State or local agency.'" Bonilla v. Meubles J.J. Alvarez, Inc., 194 F.3d 275, 278 (1st Cir. 1999) (quoting 42 U.S.C. § 2000e-5(e)) (alteration in the original); see also Rivera-Rodriguez v. Frito Lay Snacks

Caribbean, a Div. of Pepsico Puerto Rico, Inc., 265 F.3d 15, 21 (1st Cir. 2001). Because defendant does not argue that the one hundred and eighty day limitation period applies, the court will assume that at the time plaintiff filed his complaint with HRC, that agency was operating under a valid work-sharing agreement with EEOC and that the 300-day limitation period applies. See Madison v. St. Joseph Hosp., 949 F. Supp. 953, 957-58 (D.N.H. 1996) ("Since New Hampshire is . . . a 'deferral' state, complainants are allowed the extended 300-day window in which to lodge their charge.").

Defendant argues that all of plaintiff's claims relating to alleged retaliation in 1995 and 1996 are facially time-barred, and points out that plaintiff has not presented facts sufficient to bring this case within the continuing violation exception to the 300-day limitation period because: (1) plaintiff concedes that he was treated well by defendant from August 1996 through February 1999; (2) the principal act of discrimination within the limitations period, defendant's refusal to promote plaintiff, is

37

qualitatively different from the allegedly discriminatory acts in 1995 and 1996; and (3) plaintiff states that defendant's alleged mistreatment of him began again in 1999, in response to his expressing displeasure over defendant's withholding from him information generated during NHSP's investigation of White's sexual harassment complaint, which is not protected conduct under Title VII. Plaintiff counters that because the 1995 and 1996 acts of retaliation are connected to acts within the 300-day limitation period, they, too, are properly raised in the complaint filed on March 19, 1999, under the "serial violation" branch of the continuing violation doctrine. The court does not agree.

As explained above, plaintiff's claims are subject to a 300-day statutory limitation period. See Bonilla, 194 F.3d at 278. Because plaintiff filed his complaint with HRC on March 19, 1999, the complaint reaches conduct occurring between May 19, 1998, and the date of filing.

Plaintiff's attempt to reach defendant's 1995 and 1996 conduct rests on the continuing violation doctrine, which "is an equitable exception that allows an employee to seek damages for otherwise time-barred allegations if they are deemed part of an ongoing series of discriminatory acts and there is 'some violation within the statute of limitations period that anchors the earlier claims.'" Davis v. Lucent Techs., Inc., 251 F.3d 227, 235 (1st Cir. 2001) (quoting O'Rourke v. City of Providence, 235 F.3d 713, 730 (1st Cir. 2001)); see also Rivera-Rodriguez, 265 F.3d at 21 (1st Cir. 2001). Specifically, "where a Title VII violation is 'of a continuing nature, the charge of discrimination filed . . . may be timely as to all discriminatory acts encompassed by the violation so long as the charge is filed during the life of the violation or within the statutory period.'" O'Rourke, 235 F.3d at 730 (quoting Pilgrim v. Trustees of Tufts College, 118 F.3d 864, 868 (1st Cir. 1997)) (alteration in the original).

> The First Circuit has recognized two different types of continuing violations: systemic violations, which "ha[ve] [their] roots in a discriminatory policy

or practice . . . [that] itself continues into the limitation period," DeNovellis v. Shalala, 124 F.3d 298, 307 (1st Cir. 1997) (quoting Jensen [v. Frank], 912 F.2d [517,] 523 [(1st Cir. 1990)]), and serial violations, which are "composed of a number of discriminatory acts emanating from the same discriminatory animus, [with] each act constituting a separate wrong actionable under Title VII," id.; see also Mack [v. Great Atl. & Pac. Tea Co.], 871 F.2d [179,] 182-84 [(1st Cir. 1989)].

Thomas v. Eastman Kodak Co., 183 F.3d 38, 53 (1st Cir. 1999) (alterations in the original); see also Rivera-Rodriguez, 265 F.3d at 21-22.

Here, plaintiff relies upon the serial violation branch of the continuing violation doctrine.

A serial violation occurs where a chain of similar discriminatory acts emanating from the same discriminatory animus exists and where there has been some violation within the statute of limitations period that anchors the earlier claims. See DeNovellis 124 F.3d at 307. . . .

Even where a plaintiff alleges a violation within the appropriate statute of limitations period, the continuing violation claim will fail if the plaintiff was or should have been aware that he was being unlawfully discriminated against while the earlier acts, now untimely, were taking place. See Sabree [v.

40

United Bhd. of Carpenters & Joiners Local No. 33], 921 F.2d [396,] 401-02 [(1st Cir. 1990)]. . . .

In Sabree, we rejected the plaintiff's continuing violation claim because the plaintiff admitted that he believed, at every turn, that he was being discriminated against.  We reasoned that a knowing plaintiff has an obligation to file promptly or lose his claim: "[t]his can be distinguished from a plaintiff who is unable to appreciate that he is being discriminated against until he has lived through a series of acts and is thereby able to perceive the overall discriminatory pattern."  Id.; see also Jensen, 912 F.2d at 522 ("What matters is whether, when and to what extent the plaintiff was on inquiry notice."); Rush v. Scott Specialty Gases, Inc., 113 F.3d 476, 481-82 (3d Cir. 1997) (failure to claim sexual harassment earlier does not destroy the plaintiff's continuing violation claim because the evidence shows that the harassment intensified and plaintiff did not realize until later the severity of the sexual harassment).

This revelatory standard reflects the rationale of the continuing violation doctrine.  "[T]he purpose . . . is to permit the inclusion of acts whose character as discriminatory acts was not apparent at the time they occurred."  Speer v. Rand McNally & Co., 123 F.3d 658, 663 (7th Cir. 1997) (quoting Doe v. R.R. Donnelley & Sons Co., 42 F.3d 439, 446 (7th Cir. 1994)); see also Galloway [v. Gen. Motors Serv. Parts Ops.], 78 F.3d [1164,] 1166 [(7th Cir. 1996)] (plaintiffs must be encouraged to commence litigation when they become aware of conduct that would support a viable claim without forcing them to do so prematurely); West v. Philadelphia Elec. Co., 45 F.3d 744, 754 (3d Cir. 1995) (explaining that exceptions to the standard filing time serve to accommodate indeterminate situations that cannot be measured in full as they occur).

41

Provencher v. CVS Pharm., Div. of Melville Corp., 145 F.3d 5, 14-15 (1st Cir. 1998) (alterations in the original); see also Landrau-Romero v. Banco Popular de Puerto Rico, 212 F.3d 607, 612 (1st Cir. 2000) (quoting Provencher and ruling that plaintiff who had written a note complaining about allegedly discriminatory hiring more than one year before filing with EEOC did not enjoy protection of continuing violation doctrine because "[n]o continuing violation can be found where the plaintiff was aware of the alleged discrimination outside of the time for filing a charge").

The rule of Sabree, as stated in Provencher, plainly bars plaintiff's claims to the extent they are based upon defendant's actions in 1995 and 1996. Plaintiff, like the plaintiff in Sabree, believed, at the time of the acts he now complains of, that he had been retaliated against for supporting White's sexual harassment claim. Moreover, as in Landrau-Romero, the record in this case contains written statements by plaintiff, dated more

than 300 days prior to the filing of his Title VII complaint, in which he alleges that he had been retaliated against by defendant for supporting White.[6] Thus, plaintiff's own statements undermine his contention that the 1995 MAP, the 1996 performance evaluation, and the 1996 letter of warning "did not [at the time they occurred] have any crystallized implications or apparent tangible effects." Thomas, 183 F.3d at 55. Furthermore, the court notes, in passing, the seeming contradiction between: (1) plaintiff's contention that defendant's retaliatory conduct did not "crystallize," and thus reveal the importance of the letter of warning, until March 1999 (see Obj. to Def.'s Mot. Summ. J. ¶ 11); and (2) his contention that the letter of warning was, on its own, "formal discipline" that constituted an adverse employment action for the purposes of a Title VII retaliation claim (see id. ¶¶ 23-24).[7]

---

[6] These writings include the memoranda of March 20 and May 1, 1996, from plaintiff to Brodeur, and the memorandum of April 23, 1998, from plaintiff to Risley.

[7] Plaintiff's reliance on Thomas is misplaced for another reason. In that case, the plaintiff was given the benefit of the serial violation exception because the poor performance

43

Because the record is clear that plaintiff knew, as early as March 20, 1996, that defendant had engaged in conduct directed toward him that he considered to be retaliatory, within the meaning of Title VII, he is barred from maintaining a retaliation claim based upon acts that took place in 1995 and 1996. To the extent that plaintiff's suit is based upon such claims, defendant's motion for summary judgment is granted.

B.    The Merits of Plaintiff's Retaliation Claims

Plaintiff's timely retaliation claims (those arising between May 19, 1998 and March 19, 1999) are based upon the following acts or events: (1) passing him over for the internal affairs

---

evaluation scores she received in 1990, 1991, and 1992 did not result in concrete injury until 1993, when those scores were used to justify laying her off. Thomas, 183 F.3d at 55. Here, by contrast, not only was plaintiff given a poor performance evaluation on March 5, 1996, but, on the following day, he was given a formal letter of warning, which counts as "concrete injury" under the analysis used in Thomas. Having fought so hard in April and August of 1996, and April of 1998, to have the letter of warning removed from his personnel file, plaintiff cannot now be heard to argue that he only became aware of the injurious consequences of defendant's alleged retaliation at some point after May 19, 1998.

position in January 1999 and the PPO position in February 1999;[8] (2) declining to act on his memorandum of February 2, 1999, by either investigating his claim of retaliation or rescinding the March 6, 1996, letter of warning; (3) asking him to have an outside medical examination on March 4, 1999; (4) failing to provide him with a timely performance evaluation in 1999; and (5) refusing to extend the deadline for a project he was asked to complete by May 1, 1999.  In his objection to defendant's motion for summary judgment, plaintiff appears to narrow his claims somewhat, identifying three instances of protected conduct (i.e., offering supportive testimony in the trial of White's sexual harassment case against DOC, challenging his letter of warning, and filing a complaint with HRC) and three instances of retaliation by defendant (i.e., refusing him two different promotions and constructively discharging him).[9]  Based upon that

---

[8] As previously noted, the amended complaint makes no reference to defendant's refusal to promote plaintiff to two positions for which he applied at the Northern Correctional Facility.

[9] In ¶ 15 of his objection to defendant's motion for summary judgment, plaintiff lists only the unsuccessful promotion

45

recasting of his claim, plaintiff defends against summary judgment by contending that he has made out a prima facie case of retaliation.

Before turning to plaintiff's specific claims of refusal to promote and constructive discharge, an outline of the pertinent analytical framework may be helpful. "Where, as here, no direct evidence of discrimination was proffered by the plaintiff [the court] appl[ies] the McDonnell Douglas-Burdine-Hicks burden-shifting analysis to the Title VII . . . claim[]." Straughn v. Delta Air Lines, Inc., 250 F.3d, 23, 33 (1st Cir. 2001) (citing Conward v. Cambridge Sch. Comm., 171 F.3d 12, 19 (1st Cir.

---

applications and the constructive discharge as adverse employment actions taken in retaliation for his protected conduct.  In ¶¶ 24 and 27, however, he cites two other adverse employment actions: (1) the March 1996 letter of warning; and (2) DOC's falsely informing the New Hampshire Department of Employment Security ("DES") that he had been disciplined for allowing sexual harassment (see Pl.'s Obj. to Def.'s Mot. Summ. J., Ex. D).  For reasons already given, any claim based upon the letter of warning is time-barred, and because DOC's alleged misrepresentation to DES was raised for the first time in response to defendant's motion for summary judgment, that allegation is not properly pled, and the court gives it no further consideration.

1999)).  Under this paradigm: (1) "plaintiff 'must carry the initial burden . . . of establishing a prima facie case of . . . discrimination,'" id. (quoting <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802 (1973)) (alterations in the original); (2) then defendant must "articulate 'a legitimate, non-discriminatory reason for its adverse employment action[,]'" <u>Straughn</u>, 250 F.3d at 33 (quoting <u>Rodriguez-Cuervos v. Wal-Mart Stores, Inc.</u>, 181 F.3d 15, 19 (1st Cir. 1999)); and (3) if defendant carries its burden, "the burden shifts back to the plaintiff to show that the reason . . . was 'a coverup' for a 'discriminatory decision,'" <u>Straughn</u>, 250 F.3d at 34 (quoting <u>Feliciano de la Cruz v. El Conquistador Resort & Country Club</u>, 218 F.3d 1, 6 (1st Cir. 2000)) (alteration in the original).

### 1.   Refusal to Promote

Defendant argues that it is entitled to summary judgment on plaintiff's claim that he was refused promotions in retaliation for engaging in protected conduct because plaintiff has not made out a prima facie case of retaliation, defendant has articulated

47

legitimate non-discriminatory reasons for offering the two disputed positions to applicants other than plaintiff, and plaintiff has produced no evidence suggesting that defendant's explanations for offering the internal affairs and PPO positions to applicants other than plaintiff were pretextual or that discriminatory animus motivated those decisions. That is, defendant argues that plaintiff has failed to carry his burden under McDonnell Douglas. Plaintiff counters that he has made out a prima facie case. The court agrees that plaintiff has failed to meet the second of his two McDonnell Douglas burdens as to his claim of refusal to promote.

As this case stands, plaintiff says two refusals to promote him constituted actionable retaliation by DOC for his support of White: refusal to award him the internal affairs position in January 1999, and refusal to award him the PPO position in March 1999. The court assumes, without deciding, that plaintiff has made out a prima facie case of retaliation based upon failure to promote, and has thus satisfied his initial burden under

48

McDonnell Douglas.  In other words, the court assumes that plaintiff has carried his burden of showing that: "(1) he engaged in protected conduct under Title VII;[10] (2) he suffered an adverse employment action;[11] and (3) the adverse action is causally connected to the protected activity."  White v. N.H. Dep't of Corr., 221 F.3d 254, 262 (1st Cir. 2000) (quoting Hernandez-Torres v. Intercontinental Trading, Inc., 158 F.3d 43, 47 (1st Cir. 1998)).

---

[10] The court further assumes that all three actions cited by plaintiff – testifying at White's trial (in January 1999), challenging his letter of warning (by memorandum dated February 3, 1999), and filing a complaint with HRC (on March 19, 1999) – constitute protected activity.

[11] The court notes in passing that refusal to promote constitutes an adverse employment action for the purposes of a Title VII retaliation claim.  See Hernandez-Torres v. Intercontinental Trading, Inc., 158 F.3d 43, 47 (1st Cir. 1998) ("Section 2000e-3 encompasses a variety of adverse employment actions, including demotions, disadvantageous transfers or assignments, refusals to promote, unwarranted negative job evaluations, and toleration of harassment by other employees.") (citing Wyatt v. City of Boston, 35 F.3d 13, 15 (1st Cir. 1994) (emphasis added)).

Because the court assumes that plaintiff has met his initial burden under <u>McDonnell Douglas</u>, defendant assumes the burden of

> articulat[ing] "a legitimate, non-discriminatory reason for its adverse employment action[,]" [<u>Rodriguez-Cuervos</u>, 181 F.3d at 19] (citing <u>McDonnell Douglas</u>, 411 U.S. at 802; <u>Shorette v. Rite Aid of Maine, Inc.</u>, 155 F.3d 8, 12 (1st Cir. 1998)), by identifying enough admissible evidence to "support a [rational] finding that unlawful discrimination was not the cause of the employment action." <u>Feliciano</u>, 218 F.3d at 5-6 (quoting [<u>St. Mary's Honor Ctr. v.</u>] <u>Hicks</u>, 509 U.S. [502,] 507 [(1993)] (internal quotation marks omitted).

<u>Straughn</u>, 250 F.3d at 33 (parallel citations omitted) (alterations in the original). Furthermore, "[t]he employer's burden is merely a burden of production; the employee maintains the burden of proof throughout." <u>Santiago-Ramos v. Centennial P.R. Wireless Corp.</u>, 217 F.3d 46, 54 (1st Cir. 2000).

Here, defendant has articulated legitimate, non-discriminatory reasons for its decision not to promote plaintiff on each identified occasion.

50

With respect to the internal affairs position, it is worth noting that: (1) plaintiff's application was considered even though he bypassed the internal application process and responded to the outside posting; and (2) he was denied that promotion prior to the earliest of the three instances of protected conduct that took place in 1999 – his testimony at White's trial (see Miller Dep. at 98) – which means that he could not have been denied that position in retaliation for any protected conduct, because the protected conduct took place after the alleged retaliation.[12] However, even if plaintiff had engaged in protected conduct prior to being denied that position, defendant has articulated legitimate, non-discriminatory reasons for its decision. Plaintiff failed the oral interview for the internal affairs position, scoring fifth out of eight applicants. The position was offered to the applicant with the highest score on the oral interview, and was ultimately filled by the applicant

_____

[12] This same reasoning applies to the position of Acting Warden at the Northern Correctional Facility; plaintiff was notified that he would not obtain that promotion by letter dated September 22, 1998, approximately four months before the earliest of the three instances of protected conduct.

with the second highest score.  Plaintiff's score on the oral interview constitutes a legitimate, non-discriminatory basis for awarding the internal affairs position to someone other than plaintiff.

With respect to the PPO position, DOC offered that position to the applicant with the highest score on the oral interview, rather than plaintiff, who had the highest overall score.  While plaintiff disputes defendant's contention that it was standard DOC practice to award positions to the applicant with the highest oral interview score (compare Currier Aff. ¶ 4 ("In my experience the person that scores the highest in the oral interview board is generally selected for the position.") with Miller Aff. ¶ 12 ("This [Currier's statement] is simply false."), plaintiff himself was awarded the position of Shock Incarceration Unit Manager in 1989 after he had earned the highest oral interview score but only the fourth highest overall score out of seven applicants.  As with the internal affairs position, defendant has carried its burden of articulating a legitimate, non-

52

discriminatory reason for awarding the PPO position to an applicant other than plaintiff.

Because defendant has articulated legitimate, non-discriminatory reasons for its decisions not to promote him, plaintiff must show that defendant's proffered reasons for refusing to promote him were a pretextual "'coverup' for a "discriminatory decision.'"  See Straughn, 250 F.3d at 34 (citation omitted).

> At this third step in the burden-shifting analysis, "the McDonnell Douglas framework falls by the wayside," Mesnick v. General Elec. Co., 950 F.2d 816, 824 (1st Cir. 1991), because the plaintiff's burden of producing evidence to rebut the employer's stated reason for its employment action "merges with the ultimate burden of persuading the court that she has been the victim of intentional discrimination."  [Tex. Dep't of Cmty. Affairs v.] Burdine, 450 U.S. [248,] 256 [(1981)].

Feliciano de la Cruz, 218 F.3d at 6 (parallel citations omitted). More specifically, at this stage, plaintiff must "present sufficient evidence to show both that the employer's articulated reason [for the failure to promote] was a pretext and that the

53

true reason [was] discriminatory." <u>Straughn</u>, 250 F.3d at 34 (quoting <u>Thomas</u>, 183 F.3d at 56; citing <u>Fernandes v. Costa Bros. Masonry, Inc.</u>, 199 F.3d 572, 581 (1st Cir. 1999) ("[T]he plaintiff must show both that the employer's 'proffered reason is a sham, and that discriminatory animus sparked [its] actions.'") (quoting <u>Conward</u>,177 F.3d at 19)).  However, "[t]he 'same evidence used to show pretext can support a finding of discriminatory animus if it enables a factfinder reasonably to infer that unlawful discrimination was a determinative factor in the adverse employment action.'"  <u>Straughn</u>, 250 F.3d at 34 (quoting <u>Feliciano de la Cruz</u>, 218 F.3d at 6).

Plaintiff has failed to carry his burden of proffering "competent evidence . . . [which], together with all reasonable inferences which may be drawn in [his] favor, raise[s] 'a genuine issue of fact as to whether [defendant's refusal to promote him was] motivated by discrimination.'"  <u>Straughn</u>, 250 F.3d at 34 (quoting <u>Santiago-Ramos</u>, 217 F.3d at 54).  Curiously, plaintiff makes no reference to the <u>McDonnell Douglas</u> framework in his

54

objection to defendant's motion for summary judgment, and addresses the issue of pretext only once, in a context unrelated to the third step in the McDonnell Douglas paradigm. (Pl.'s Obj. to Def.'s Mot. Summ. J. ¶ 15). In ¶ 15 of his objection, which discusses the causation element of a prima facie case of discrimination, plaintiff states: "A second basis upon which to find a causal connection [between defendant's alleged retaliatory acts and plaintiff's protected conduct] is by the evidence that DOC's stated reasons for the retaliatory conduct is [sic] mere pretext." However, plaintiff's objection to defendant's motion for summary judgment is strikingly thin on evidence from which a reasonable factfinder might conclude that the reasons given for his non-selection were pretextual or that defendant's decisions were in fact based upon a discriminatory animus.

The closest plaintiff comes to making a credible pretext charge is his assertion that it is DOC policy to select job applicants with the highest overall score rather than the highest score on the oral interview. However, plaintiff's own employment

history disproves that claim; he successfully applied for a transfer to manage the Shock Incarceration Unit in 1989, having attained only the fourth highest overall score among seven applicants, but the highest score on the oral interview. Moreover, plaintiff's proof fails to satisfy any of the judicially accepted methods of establishing pretext discussed below.

First, plaintiff has provided no evidence from which a reasonable factfinder could conclude that those involved in selecting the successful applicants for the internal affairs and PPO positions believed that he was the best qualified applicant but selected another applicant instead. See Feliciano de la Cruz, 218 F.3d at 7 ("In evaluating whether El Conquistador's stated reason for firing her was pretextual, the question is not whether Feliciano was actually performing below expectations, but whether El Conquistador believed that she was.") (citing Mulero-Rodriquez [v. Ponte, Inc.], 98 F.3d [670,] 674 [(1st Cir. 1996)]; Goldman v. First Nat'l Bank of Boston, 985 F.2d 1113, 1118 (1st

Cir. 1993)). The evidence on this point consists of: (1) the contemporaneously generated records of the scores given to plaintiff by two different promotion boards; (2) Currier's explanation of how an appointing official makes use of such scores; and (3) plaintiff's disagreement with Currier's explanation. However, plaintiff's argumentative and conclusory disagreement with Currier - based upon little more than his own prior practice as an appointing official – is insufficient to create a genuine issue of material fact.

Second, plaintiff has proffered no evidence to show that defendant's "non-discriminatory reasons were after-the-fact justifications, provided subsequent to the beginning of legal action." Santiago-Ramos, 217 F.3d at 56 (citing Mariani Giron v. Acevedo Ruiz, 834 F.2d 238, 239 (1st Cir. 1987); Lex K. Larson, 1 Employment Discrimination § 8.04 at 8-76 (2d ed. 2000)). Rather, the factual record in this case contains contemporaneous documentation of the scores plaintiff received during the course of both of the application processes at issue here.

57

Third, based upon the evidence he has produced, plaintiff cannot "establish pretext by showing 'weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons' such that a factfinder could 'infer that the employer did not act for the asserted non-discriminatory reasons.'" Santiago-Ramos, 217 F.3d at 56 (quoting Hodgens v. Gen. Dynamics Corp., 144 F.3d 151, 168 (1st Cir. 1998)). Rather, defendant's proffered non-discriminatory reasons are entirely plausible. Two different promotion boards interviewed plaintiff,[13] and in both cases, the positions plaintiff sought were given to applicants with higher scores on the oral interviews. As stated above, plaintiff's only colorable claim of inconsistency – awarding the PPO position to

_____

[13] The oral interviews conducted by promotion boards are based upon standard sets of questions (see, e.g., Def.'s Mot. Summ. J., Ex. 8), which would appear to constrain the interviewers' subjectivity. Plaintiff can name just two of the three members of the promotion board for the internal affairs position (Miller Dep. at 99) and just one of the three members of the promotion board for the PPO position (Miller Dep. at 100-01), and he alleges no facts to support a finding that any of those three people had knowledge of any of his protected conduct, which considerably weakens any assertion that the decisions not to promote him were retaliatory.

an applicant with a lower overall score – may have been inconsistent with plaintiff's wishes in 1999, but was entirely consistent with the manner in which plaintiff himself was awarded a transfer in 1989.

Plaintiff fares no better with respect to discriminatory animus. He does not claim, and produces no evidence to prove, that any of those involved in making selection decisions for the internal affairs or PPO positions had any knowledge of his protected conduct, which presents a logical obstacle to any assertion that those persons made decisions based upon discriminatory animus. Other than his own supposition that he had been retaliated against, plaintiff has produced no evidence whatsoever of defendant's discriminatory animus toward him. That is, plaintiff has produced no evidence that agents of defendant ever said or did anything – other than taking the adverse employment actions he now complains of – that betrayed any animosity toward him based upon his protected conduct. While "[t]he burden of persuasion on pretext may be met, inter alia, by

59

showing 'that discriminatory comments were made by the key decisionmaker or those in a position to influence the decisionmaker,'" Straughn, 250 F.3d at 35 (quoting Santiago-Ramos, 217 F.3d at 55), plaintiff has not even alleged any "stray remarks," id. at 36, that hint at a discriminatory animus on defendant's part, much less any comments that bear directly on the issue.

In short, based upon a consideration of "all the circumstantial evidence of discrimination, including the strength of the plaintiff's prima facie case and the employer's proffered reasons for its action," Feliciano de la Cruz, 218 F.3d at 7, the court concludes that plaintiff has failed to carry his burden under the third part of McDonnell Douglas.  That is, he has failed to identify a triable issue of material fact by failing to "produce evidence that: (1) the employer's articulated reason[s] for [denying him the promotions he sought were] a pretext; and (2) the true reason[s] [were] discriminatory animus."  Feliciano de la Cruz, 218 F.3d at 6 (citing Thomas, 183 F.3d at 56).

60

Accordingly, as to plaintiff's claim that he was denied the internal affairs and PPO positions in violation of Title VII, defendant's motion for summary judgment is granted.[14]

### 2. Constructive Discharge

Defendant moves for summary judgment on plaintiff's retaliatory constructive discharge claim on grounds that he has failed to make out a prima facie case of constructive discharge. Plaintiff defends in a most conclusory fashion (see Pl.'s Obj. to Def.'s Mot. Summ. J. ¶¶ 26, 32 & 33), and provides no evidence beyond swearing to the allegations in his amended complaint. The court agrees that plaintiff has failed to make out a prima facie case of constructive discharge.

---

[14] Plaintiff's claims of retaliation in 1995 and 1996 were not filed in a timely manner and, as a result, are not analyzed under the McDonnell Douglas framework. However, if the court were to conduct such an analysis, it would find, as with the claims of retaliation in 1998 and 1999, that plaintiff has failed to carry his burden of production on the issues of pretext and discriminatory animus.

Retaliatory constructive discharge is an actionable adverse employment action under Title VII.  See Hernandez-Torres, 158 F.3d at 47-48 ("A 'discharge' under § 2000e-3(a) may be constructive as well as a direct firing.") (citing Hart v. University Sys. of N.H., 938 F.Supp. 104, 111 (D.N.H. 1996); Munday v. Waste Mgmt. of N. Am., Inc., 126 F.3d 239, 243 (4th Cir. 1997)).  According to Munday, "[c]onstructive discharge may be an adverse employment action in violation of § 20003e-3(a) [sic] 'when the record discloses that it was in retaliation for the employee's exercise of rights protected by the Act.'"  Id. at 243 (quoting Holsey v. Armour & Co., 743 F.2d 199, 209 (4th Cir. 1984)).

Because constructive discharge can be an adverse employment action for purposes of Title VII, a claim of retaliatory constructive discharge is analyzed under the McDonnell Douglas framework.  See, e.g., Hart, 938 F.Supp. 107.

> To establish a prima facie case of retaliatory
> discharge under Title VII [to meet the first step of
> McDonnell Douglas], [plaintiff] must make the following

showing: (1) [he] engaged in an activity protected by Title VII; (2) [he] was actually or constructively discharged from [his] employment; and (3) a causal connection existed between [his] protected conduct and the discharge.

Id. (citing Hoeppner v. Crotched Mtn. Rehab. Ctr., Inc., 31 F.3d 9, 14 (1st Cir. 1994); Ramos v. Roche Prods., Inc., 936 F.2d 43, 48 (1st Cir. 1991); 42 U.S.C. 2000e-3(a)).

As with plaintiff's claims of failure to promote, the court will assume that plaintiff has made out the first element of the prima facie case. However, plaintiff was not constructively discharged.

To establish a claim of constructive discharge, the evidence must support a finding that "'the new working conditions would have been so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign.'" Greenberg v. Union Camp Corp., 48 F.3d 22, 27 (1st Cir. 1995) (quoting Calhoun v. Acme Cleveland Corp., 798 F.2d 559, 561 (1st Cir. 1986) (further quotation omitted)); Godfrey v. Perkin-Elmer Corp., 794 F.Supp. 1179, 1186 (D.N.H. 1992). The applicable legal standard is objective, requiring an inquiry into the "reasonable state of mind" of the person experiencing the new conditions. Greenberg, supra, 48 F.3d at 27 (quotation omitted). Therefore, a claim for constructive discharge cannot

63

> hinge on an unreasonable reaction to one's work
> environment. Id.; Vega v. Kodak Caribbean, Ltd., 3
> F.3d 476, 481 (1st Cir. 1993).

Hart, 938 F. Supp. at 107-08. As the First Circuit has stated more recently, to establish constructive discharge, "the plaintiff must prove that his employer imposed working conditions so intolerable that a reasonable person would feel compelled to forsake his job rather than to submit to looming indignities." Landrau-Romero, 212 F.3d at 613 (quoting Simas v. First Citizens' Fed. Credit Union, 170 F.3d 37, 46 (1st Cir. 1999)) (internal quotation marks, alterations, and additional citations omitted). And in the context of a Title VII retaliatory constructive discharge claim, plaintiff "must establish that his work environment was hostile." Hernandez-Torres, 158 F.3d at 48 (citing Smith v. Bath Iron Works Corp., 943 F.2d 164, 166 (1st Cir. 1991); Schwapp v. Town of Avon, 118 F.3d 106, 112 (2d Cir. 1997); Konstantopoulos v. Westvaco Corp., 112 F.3d 710, 718 (3d Cir. 1997); Landgraf v. USI Film Prods., 968 F.2d 427, 430 (5th Cir. 1992) ("To prove constructive discharge, the plaintiff must demonstrate a greater severity or pervasiveness of harassment

64

than the minimum required to prove a hostile work environment [in a Title VII sexual harassment case].")).  As for the evil that the doctrine of constructive discharge is intended to prevent, "[a]n employee is protected from a calculated effort to pressure him into resignation through the imposition of unreasonably harsh conditions, in excess of those faced by his co-workers [but] [h]e is not . . . guaranteed a working environment free of stress." Munday, 126 F.3d at 244 (quoting Bristow v. Daily Press, Inc., 770 F.2d 1251, 1255 (4th Cir. 1985)).

Here, the acts of hostility alleged by plaintiff, even when viewed in the light most favorable to him, "do not rise to the level of objective intolerability sufficient to create an adverse employment action under § 2000e-3(a)."  Munday, 126 F.3d at 244. An examination of plaintiff's HRC filing, his amended complaint, and his objection to defendant's motion for summary judgment reveals that plaintiff claims the following retaliatory acts[15] by

_____

[15] Because plaintiff is claiming retaliatory constructive discharge, the court considers only those acts by defendant that post-date plaintiff's earliest cognizable protected conduct,

defendant compelled his resignation: (1) refusing him the PPO position; (2) failing to explain why he did not do well before a recent promotion board; (3) denying his third request to rescind the March 1996 letter of warning; (4) failing to respond to various memoranda he sent; (5) asking him to submit to an outside medical examination to determine his mental fitness for duty; (6) shunning him at a DOC event; (7) failing to provide him with a timely performance evaluation in 1999; and (8) denying him an extension of time to complete a project in April 1999.

As a preliminary matter, plaintiff has conceded that he "made an issue out of them [DOC officials] not informing me that two of my employees lied to investigations [sic]." (Miller Dep. at 83.) Plainly, plaintiff's subjective belief that defendant had withheld information to which he was entitled colored his interpretation of the events that transpired between White's trial in January 1999 and his resignation on May 7. Furthermore,

which appears to be his testimony at White's trial in January 1999.

66

plaintiff's unhappiness over his discovery, at White's trial, that Colby and Ciccone had lied to investigators was, in his own words, the reason he made a third attempt to have the letter of warning removed from his personnel file.  (See Miller Aff. ¶ 1(14a).)  But because defendant's failure to provide plaintiff with the report of its 1995-1996 sexual harassment investigation (and it seems unlikely that plaintiff was entitled to receive a copy under New Hampshire law) is a separate issue from plaintiff's subsequent discovery of information in that report, and because the court is obligated to employ an objective standard when evaluating a claim of constructive discharge, plaintiff's reported subjective state of mind following White's trial must be discounted.

That said, it appears that less than half the acts that plaintiff considers to have been retaliatory were things that defendant's agents did on their own initiative.  Most of the allegedly "retaliatory acts" plaintiff identifies were failures to respond, in the ways plaintiff had hoped for, to various

requests he had made, such as: (1) his request for an explanation of the rating he received from a recent promotion board; (2) his third request to have the letter of warning rescinded; and (3) his request for an extension of time to complete the project that was due on May 1.

Several of the retaliatory acts alleged by plaintiff are simply trivial. These include: (1) shunning him at a DOC event (this allegation is highly subjective, as well); (2) failing, for no more than several months, to conduct his annual performance evaluation; and (3) denying him an extension of time to complete the project due May 1. As for the more significant acts of retaliation alleged by plaintiff, all three wilt under the light of objective scrutiny. While plaintiff was refused the PPO promotion, the record contains a contemporaneously produced, objectively reasonable explanation for defendant's decision to offer the position to someone other than plaintiff. In plaintiff's view, defendant's failure to rescind his letter of warning appears to constitute a major retaliatory act, but from

an objective perspective, it is difficult to see the hostility in defendant's decision to maintain the position it had held consistently since 1996, i.e., that the letter of warning was warranted.[16]  Finally, while an employer's request that an employee submit to a medical examination to determine his mental fitness for duty might constitute a hostile act under some circumstances, defendant's conduct in this case was not objectively hostile.  Defendant asked plaintiff to submit to an independent medical examination at some point after: (1) plaintiff had "raised his voice" in an angry confrontation with Risley; and (2) plaintiff himself had informed defendant, in his February 2, 1999, memorandum, that he was suffering from work-related health problems.  In context, defendant's request cannot reasonably be interpreted as hostile.

---

[16] Plaintiff has failed to elucidate the connection between Colby and Ciccone's lying to investigators, after White filed her harassment claim, and the alleged inappropriateness of his being disciplined for poor judgment, lack of leadership, and other mismanagement that his employer believed had helped create the environment that gave rise to White's harassment.  Without such a connection, it is difficult to see why evidence that Colby and Ciccone had lied to investigators would entitle plaintiff to have the letter of warning removed from his file.

In short, the acts attributed to defendant in this case did not, individually or in combination, create a work environment that was sufficiently hostile to leave plaintiff with no reasonable alternative other than resignation.  See Hart, 938 F.Supp at 108 (citations omitted) (giving, as examples of hostile employer conduct: (1) public ridicule of an employee; (2) demotion or reduction in pay; (3) suggestions or demands that an employee resign; and (4) informal criticisms of employee performance that contradict formal performance evaluations). Because plaintiff has failed to make out a prima facie case of retaliatory constructive discharge, he has not carried his first burden under McDonnell Douglas, and as a result, as to plaintiff's claim that he was subjected to a constructive discharge, in violation of Title VII, defendant's motion for summary judgment is granted.

IV.  Summary

Defendant is entitled to summary judgment because: (1) plaintiff has failed to produce evidence to show that defendant's

reasons for not promoting him were pretextual or that those decisions were motivated by a discriminatory animus, under the third step of McDonnell Douglas; and (2) plaintiff has failed to make out a prima facie case of retaliatory constructive discharge, under the first step of McDonnell Douglas.

## Conclusion

For the reasons given, defendant's motion to strike (document no. 21) is denied and defendant's motion for summary judgment (document no. 18) is granted. The Clerk of Court shall enter judgment in accordance with this order and close the case.


**SO ORDERED.**



_____
Steven J. McAuliffe
United States District Judge

November 13, 2001

cc:  Michael J. Sheehan, Esq.
     Nancy J. Smith, Esq.